# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| _____ | ) | |
| LUKE FRAZZA and MARY FRAZZA, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No: 06-1410 (CKK) |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Pursuant to Federal Rule of Civil Procedure 56, defendant United States of America hereby moves this Court for an order granting summary judgment in its favor. The record in this case shows that no genuine issue as to any material fact exists as to the claims being made by plaintiffs, and defendant is entitled to judgment as a matter of law.

In support of this motion, defendant respectfully refers the Court to the accompanying memorandum of points and authorities, and to the accompanying statement of material facts as to which there is no genuine dispute. A proposed order is also attached.

Dated: May 18, 2007.

Respectfully submitted,

_____
JEFFREY A. TAYLOR, D.C. Bar # 498610
United States Attorney

 /s/
_____
RUDOLPH CONTRERAS, D.C. BAR #434122
Assistant United States Attorney

_____/s/_____

JANE M. LYONS, D.C. Bar # 451737
Assistant United States Attorney
555 4th Street, N.W. - Room E4822
Washington, D.C. 20530
(202) 514-7161
(202) 514-8780 (facsimile)

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| _____ ) | |
| LUKE FRAZZA and MARY FRAZZA,  ) | |
| ) | |
| Plaintiffs,  ) | |
| ) | |
| v.  ) | Civil Action No: 06-1410 (CKK) |
| ) | |
| UNITED STATES OF AMERICA,  ) | |
| ) | |
| Defendant.  ) | |
| _____ ) | |

**DEFENDANT'S MEMORANDUM IN SUPPORT OF SUMMARY JUDGMENT**

This slip-and-fall action fails for proof of one of the essential elements of plaintiffs'

negligence claims: breach of an applicable and defined standard of care.  ***Plaintiffs' own expert***

concedes that his test of the coefficient of friction for tile floor on which Mr. Frazza slipped at

the White House on January 23, 2005 tested above the American Society of Testing Materials

standard for safety when the floor was both dry and wet.  Because plaintiffs offer no other proper

evidentiary support for any other standard of care, and because the testimony of plaintiffs' own

expert demonstrates that no reasonable fact-finder could find a breach of a relevant standard of

care, the United States cannot be found liable for negligence.  Accordingly, judgment should be

entered in favor of defendant.

I.     **LEGAL STANDARDS**

       A.     **Summary Judgment**

       A party is entitled to summary judgment if the pleadings, depositions, and affidavits

demonstrate that there is no genuine issue of material fact in dispute and that the moving party is

entitled to judgment as a matter of law.  See Fed. R. Civ. P. 56(c); Tao v. Freeh, 27 F.3d 635,

638 (D.C. Cir. 1994). Under the summary judgment standard, the moving party bears the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). In short, defendant is entitled to summary judgment, if viewing the evidence in the light most favorable to plaintiffs, no reasonable fact-finder could find that plaintiffs established each of the elements of negligence. See United States ex rel. Bettis v. Odebrecht Contractors of Cal., Inc., 393 F.3d 1321, 1327 (D.C. Cir. 2005). This motion focuses on the establishment of the standard of care and its breach.

**B.    Liability Under the Federal Tort Claims Act**

The law is well-settled that the United States, as a sovereign, may be sued only to the extent that it has consented to suit by statute. See Federal Deposit Ins. Corp. v. Meyer, 510 U.S. 471, 475 (1994); United States v. Testan, 424 U.S. 392, 399 (1976). A waiver of immunity must be explicit. See Honda v. Clark, 386 U.S. 484, 501 (1967). The exclusive remedy for common law tort claims is the FTCA. 28 U.S.C. § 2679(a); Meyer, 510 U.S. at 473. The FTCA authorizes district courts to hear suits against the United States

> for money damages ... for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

28 U.S.C. § 1346(b); see also Cope v. Scott, 45 F.3d 445, 447 (D.C. Cir. 1995).

Plaintiff filed this action under a negligence theory.  See Complaint, ¶ 8.  Hence, the governing law is that for negligence in the District of Columbia.  "To establish negligence a plaintiff must prove a duty of care owed by the defendant to the plaintiff, a breach of that duty by the defendant, and damage to the interests of the plaintiff, proximately caused by the breach." District of Columbia v. Beretta, U.S.A., Corp., 847 A.2d 1127, 1135 n.2 (D.C. 2004) (quoting District of Columbia v. Harris, 770 A.2d 82, 87 (D.C.2001)) (quotation marks and alteration omitted).  More specifically, under District of Columbia law, a landholder must act reasonably to maintain its property in a reasonably safe condition in view of all the circumstances including the likelihood of injury, the seriousness of the injury, and the burden of avoiding the risk. Nelson v. U.S., 838 F.2d 1280, 1285 (D.C. Cir. 1988) (citing Smith v. Arbaugh's Restaurant, 469 F.2d 97, 100 (D.C. Cir. 1972 (a dog bite case)).  "[T]he status of an entrant onto the property is not solely determinative of the duty of care owed him.  Of course, the circumstances of the visitor's entry have some relation to the question of landowner liability.  Foreseeability of the visitor's presence determines in part the likelihood of injury to him, and the extent of the interest which must be sacrificed to avoid the risk of injury."  Sandoe v. Lefta Assocs., 559 A.2d 732, 740 (D.C. 1988) (quoting Smith v. Arbaugh's Restaurant, Inc., 469 F.2d at 100); see also Nelson v. U.S., 838 F.2d at 1286 (under the District of Columbia's "reasonable care standard, the common law distinctions are retained only insofar as the foreseeability of the entrant's presence bears on the question whether the landowner acted with reasonable care.") (internal citations omitted).

II.    **ARGUMENT**

Plaintiff Luke Frazza is a photographer for a news media organization.  Complaint, ¶ 3.

In January, 2005, his responsibilities included obtaining images of the President of the United

States and he had access to portions of the White House complex for that purpose.  See

Complaint, ¶ 3; Deposition of Luke Frazza ("Frazza Dep."), at 7-8.  On January 23, 2005, Mr.

Frazza was carrying his usual complement of photographic and other equipment, which he

estimates weighed approximately thirty-five pounds, when he slipped and fell as he entered a

doorway leading from the outside into the press lunch area at the White House.  Complaint, ¶ 5;

Frazza Dep. at 32.  Mr. Frazza described incident as follows:

> Well, as I approached the door I - - my recollection is I opened the door with my
> right hand.  I think the door opens in.  And I stepped in with my left foot, hit a wet
> tile surface where there was no floor mat, and my feet went out from under me, up
> in the air.  I landed very hard on my backside and really hurt myself.

Deposition of Luke Frazza ("Frazza Dep.), at 49 (attached as Exhibit 3).  Thus, the focus of this

case is the condition of the floor where Mr. Frazza allegedly slipped.

With regard to the floor, Mr. Frazza testified that:

> Q.    What do you remember about the floor as you, as you were down there for 30
>
>        seconds to a minute?
>
> A.    It was hard.
>
> Q.    It was hard.  Anything else?
>
> A.    I think it was wet, the fact that I slipped.

Id. at 52-53.  Notably, Mr. Frazza grounds his assertion that the floor was wet solely on the fact

that he fell, and Mr. Frazza described nothing else of note about the floor.  By itself, that Mr.

Frazza's assumption that the cause of his fall was a wet floor is not enough to establish liability.

- 4 -

See Thomas v. Grand Hyatt Hotel, 749 F. Supp. 313, 314-15 (D.D.C. 1990) (granting

defendant's motion for summary judgment on claim by model who slipped during fashion show

where "plaintiff believe[d] something on her shoe caused her fall" because finder of fact could

not speculate on cause of her fall), aff'd, 957 F.2d 912 (D.C. Cir. 1992).

Under D.C. law, a plaintiff alleging negligence "'has the burden of proving . . . the

applicable standard of care, a deviation from that standard by the defendant, and a causal

relationship between the deviation and the ... injury.'" Varner v. District of Columbia, 891 A.2d

260, 265 (D.C. 2006) (quoting District of Columbia v. Wilson, 721 A.2d 591, 597 (D.C. 1998));

accord Butera v. District of Columbia, 235 F.3d 637, 659 (D.C. Cir. 2001).  With few exceptions

not applicable here because of the nature of the claims, expert testimony is required to establish

the applicable standard of care and a breach of it.  Pursuant to the "expert testimony

requirement," District of Columbia v. Hampton, 666 A.2d 30, 35-36 (D.C.1995), "'[a] plaintiff

must put on expert testimony to establish what the standard of care is if the subject in question is

so distinctly related to some science, profession or occupation as to be beyond the ken of the

average layperson,'"  District of Columbia v. Arnold & Porter, 756 A.2d 427, 433 (D.C. 2000)

(quoting Messina v. District of Columbia, 663 A.2d 535, 538 (D.C.1995)); see also Briggs v.

Washington Metropolitan Transit Authority, No. 06-7037, 481 F.3d 839 (D.C. Cir. March 27,

2007).

Because the primary liability issue in a slip-and-fall is one of safety, expert testimony is

critical.  Varner, 891 A.2d at 267.  Expert testimony

> is not sufficient if it consists merely of the expert's opinion as to what he or she
> would do under similar circumstances. Nor is it enough for the expert simply to
> declare that the [defendant] violated the national standard of care. Rather, the
> expert must clearly articulate and reference a standard of care by which the

defendant's actions can be measured. Thus the expert must clearly relate the standard of care to the practices in fact generally followed by other comparable ... facilities or to some standard nationally recognized by such units.

Clark v. District of Columbia, 708 A.2d 632, 635 (D.C.1997) (internal quotation marks and citations omitted).

In this case, plaintiffs identified Randal Atlas, Ph.D., a registered architect, as an expert on "human factors, ergonomics, and architectural safety issues." See Plaintiffs' Expert Witness Statement (attached as Exhibit 4). In his January 26, 2007 opinion, Dr. Atlas stated that the applicable standard for evaluating the tile surface where Mr. Frazza allegedly fell is found in the American Society of Testing Materials Technical Publication No. 649 ("ASTM No. 649"). See Jan. 26, 2007 Expert Report (attached as Exhibit 1).[1] That publication identified a coefficient of friction of 0.5 as the benchmark: coefficients above 0.5 are considered acceptably safe and below 0.5 are not.

In October, 2006, Dr. Atlas personally conducted tests of the coefficient of friction of the tile where Mr. Frazza actually fell. Dr. Atlas explained in his deposition that he performed a standard test for the coefficient of friction under three different conditions: dry, wet with water, and icy. See Deposition of Randall J. Atlas ("Atlas Dep.) at 25-27 (attached as Exhibit 2).[2] Dr. Atlas himself conducted tests during his site visit to the exact place where Mr. Frazza allegedly slipped, and he found that the floor tested with a coefficient of friction of 0.57 when dry and

---

[1] Dr. Atlas's doctoral degree is in criminology. See Exhibit 1 at 3. Under the Court's schedule as modified in the February 2, 2007 Minute Order, plaintiffs had until April 6, 2007 to provide any rebuttal expert disclosures, and plaintiffs did not do so.

[2] Cited excerpts to Dr. Atlas's deposition are attached as Exhibit 2.

should be considered safe and within the standard of care.  Id.; see Exhibit 1 [Atlas Report] at 1-2; Exhibit 2 [Atlas Dep.] at 39, 50.

In his Report, Dr. Atlas also indicated that he determined that the floor when wet had a coefficient of 0.32 which would fall below the standard for floor safety established by the ASTM.  See Exhibit 1 [Atlas Report] at 2.  Critically, however, Dr. Atlas testified very differently in his deposition about the coefficient of friction of the tile Mr. Frazza slipped on when it became wet.  In his deposition, Mr. Atlas reiterated that the applicable standard of care was that of the ASTM No. 649 and that flooring with a coefficient of friction at or over 0.5 was considered within the standard of care.  See Exhibit 2 [Atlas Dep.] at 48-49.  But after he was confronted with his own data and was asked more specifically about the results of his tests when the floor was wet but not icy, Dr. Atlas admitted that he averaged the data he obtained for wet and icy conditions.  Critically, Dr. Atlas acknowledged that the coefficient of friction for the floor when wet was higher than when dry and well within the standard of care set by the ASTM:

> Q.     For the dry test you conducted you found a coefficient of friction of point 57 so that would be safe, correct?
>
> A.     Yes, ma'am.
>
> Q.     Now, you only gave one wet coefficient of friction that's for 0.32.  And you have three sets of data, so which points did you use to come up with the point 32?
>
> A.     . . . It was using the ice data not just the water.
>
> Q.     So point 32 includes --

A.    And, actually, it ranges from point three to point four. So you would average of the four pulls, it would be between point three and point four. So it would be about point 35.

Q.    What would be about point 35?

A.    The coefficient of friction, when I did the test for ice.

Q.    Okay. What is it for just wet?

A.    It averages actually point 85. It was actually more slip resistant, and my explanation for that is, that sometimes when you do these coefficient of friction tests and they have the rubber booties, the way - - they sort of feel almost like a little vacuum or suction, so it actually sort of - - with the water, and it sort actually showed more slip resistance with the wet conditions.

Q.    I want to make sure I understand, Mr. Atlas. Are you saying that the coefficient of friction for the wet test that you conducted was point 85?

A.    Yes, ma'am.

Q.    How come you didn't include that in your report, you didn't think that was important?

A.    It was - - it was just - - I figured almost an anomaly it was unusual to find where the coefficient of friction when it was wet was actually greater than when it was dry.

Q.    But you testified that it's possible?

A.    Yes.

Q.    Did you think your data was flawed?

- 8 -

A.     No.  I conducted the test and rechecked my results and when it was wet, the vinyl

tile has a quality about it that, actually, this particular vinyl floor was gripping the

ribber booties and not letting go.

Q.     So in your report when you said that the coefficient of  - - well, you say a wet

coefficient of friction of 0.32, that's inaccurate, correct?

A.     For - - actually, it would be wet with the ice.  What I didn't say - -

Q.     You combined the data?

A.     Correct.

Exhibit 2 [Atlas Dep.] at 50-52.  Dr. Atlas's presentation in his Report of a result for "wet" tile

of 0.32 was inaccurate and grossly misleading.

On the other hand, Dr. Atlas's deposition testimony affirmatively demonstrates

defendant's compliance with the standard of care he identified from ASTM No. 649.  Based on

Mr. Frazza's own version of the state of the floor quoted above, no reasonable fact-finder could

find that there was any ice on the floor when Mr. Frazza says he fell.  Moreover, Dr. Atlas

readily admitted that Mr. Frazza never indicated to him that there was any ice on the floor where

he supposedly fell:

Q.     Did Mr. Frazza indicate to you when he fell that there was ice on the floor?

A.     He did not specifically state that there was ice on the floor, he did not look at the

floor when he stepped in, so he was not aware of any conditions that were on that

floor prior to him stepping on it.

Exhibit 2 [Atlas Dep.] at 55.  Thus, the expert evidence proffered by plaintiffs relating to the standard of care as defined by the coefficient of friction test in ASTM No. 649 proves that there was no breach of the standard of care.

The only evidence Dr. Atlas offered beyond the coefficient of friction test is his supposed "experience" that there is the supposedly "customary and standard practice" of placing mats and warning cones at the entrances of buildings in the northeast.  Exhibit 1 [Atlas Report], at 2.  This amounts to little more than his general, lay opinion that the floor might have been safer if a mat had been placed in the doorway where Mr. Frazza slipped.  This aspect of Dr. Atlas's opinion is not based on a sufficiently established or recognized standard of care because an expert must proffer "a specific, articulable (and articulated) standard of care." Carmichael, 577 A.2d at 315; see Phillips v. District of Columbia, 714 A.2d 768, 773 (D.C.1998) ("[T]he expert must testify as to specific ... standards and must relate them directly to the defendant's conduct." (internal citation omitted)).[3]  Here, Dr. Atlas testified merely that he believed this standard applied in the Northeast, and that this aspect of his Report was primarily based, not on a published standard, but on his observation of unidentified buildings with unknown flooring surfaces while walking between the hotel where he stayed and plaintiffs' counsel's office on a rainy day in October.  See Exhibit 2 [Atlas Dep.] at 73-75 (". . . it's standard practice in the northeast that when you have wet conditions. . . it is standard practice to put down mats and do the cones").

---

[3]  See also Kumho Tire Co. v. Carmichael, 526 U.S. 137, 141 (1999) (describing the trial court's "gate keeping function" under Fed. R. Evid. 702 with regard to the admissibility of expert opinions); Burkhart v. Washington Metro. Area Transit Auth., 112 F.3d 1207, 1211 (D.C. Cir. 1997).

This portion of Dr. Atlas's Report contains exactly the sort of "opinion as to what [Dr. Atlas] would do under similar circumstances" based on an unrecognized and unpublished "national standard of care" forbidden in Clark. Clark, 708 A.2d at 635.[4]  Moreover, the Court may take judicial notice of the location of Washington, D.C., and to the extent there is any doubt, Washington, D.C. is not commonly considered to be part of the northeastern United States, and properly being within the Mid-Atlantic region.  Certainly, Dr. Atlas offered no basis for his geographic assertion other than his own understanding of the geography of the country.  See Exhibit 2 [Atlas Dep.] at 104-105.  Furthermore, Dr. Atlas specifically acknowledged that there is a difference in the public entrances to commercial buildings and areas not commonly used by

_____

[4]  To be reliable, "[p]roposed [expert] testimony must be supported by appropriate validation, i.e., 'good grounds,' based on what is known." Daubert v. v. Merrell Dow Pharm., Inc., 509 U.S. 579, 590 (1993).  To be relevant, it must "fit" the case; that is, be sufficiently tied to the facts of the case to help the trier of fact understand the evidence or resolve a factual dispute. Id. at 591.  Fed. R. Civ. 702 gives a screening role to the trial judge, who must "ensur[e] that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." Id. at 597.  Daubert sets forth the following criteria for determining what evidence may pass the reliability gate:  (1) whether the theory has been or can be tested; (2) whether the theory was subject to peer review or publication; (3) the theory's potential rate of error; and (4) the general acceptance of the theory within the relevant scientific community.  Daubert, 509 U.S. at 592-94. Judges have broad flexibility in screening proffered testimony.  Specific factors were cited by the Daubert Court as useful in assessing reliability, but the Court in Kumho Tire noted that the Daubert list was not exclusive and urged trial courts to employ them only when they would be helpful: "the law grants a district court . . . broad latitude when it decides how to determine reliability . . . ." Id. at 141-42 (citing General Elec. Co. v. Joiner, 522 U.S. 136, 143 (1997)). Nevertheless, it is clear that Dr. Atlas is not relying on a peer reviewed or published standard and has failed to demonstrate general acceptance of his assertion that there is any standard of care requiring placement of mats in the conditions present at the White House on January 23, 2005. The focus of the inquiry must be on the expert's principles and methods rather than his conclusions.  See Daubert, 509 U.S. at 595.  "Expert testimony that rests solely on 'subjective belief or unsupported speculation' is not reliable" and should not be admitted.  Groobert v. President & Dirs. of Georgetown College, 219 F.Supp.2d 1, 6 (D.D.C. 2002) (citing Daubert, 509 U.S. at 590).

the public, and that Mr. Frazza was not using a public entrance to the White House similar to that

in the commercial buildings described generally by Dr. Atlas on his walk.  Id. at 79.

Dr. Atlas's opinion boils down to the notion that the area where Mr. Frazza fell might

have been safer if a mat had been placed there.  This is just the sort of common sense that may

not substitute for expert opinion.  For example, in Briggs v. Washington Metropolitan Area

Transit Auth., No. 06-7037, 481 F.3d 839 (D.C. Cir. March 27, 2007), the D.C. Circuit affirmed

the grant of summary judgment to defendant and held that plaintiff's expert opinion -- that more

lighting would have made the area safer -- was insufficient to establish the standard of care.  Id.

at 846, 847.  Despite the expert's reference to "studies demonstrating that street lighting

decreases crime," id. at 842, the Court found that the expert failed to  ground his opinion in any

applicable standard:

> At first blush, there is arguably . . . appeal to [Briggs'] suggestion that the average
> juror does not require advice from experts to determine whether lighting must be
> increased or plywood taken down.  But such a judgment is based on bare intuition
> of this sort would be misguided.  The D.C. Court of Appeals has required expert
> testimony in a number of cases that, on first blush, appear to be within the realm
> of common knowledge. . . . The case law indicates that the "common knowledge"
> exception to the expert testimony requirement is recognized only in cases in
> which everyday experience makes it clear that jurors could not reasonably
> disagree over the care required.
>
> *    *    *
>
> While lay persons can certainly distinguish between illumination and compete
> darkness, there is nothing to indicate that common knowledge includes a
> universal standard of "adequate" lighting within a temporary construction
> walkway.

Briggs, 481 F.3d at 845-46 (citations and quotations omitted); see id. at 847 (because the expert

pointed to no specific standards or guidelines and "rested on only generalized objectives," his

"recommendations, albeit laudatory, are too vague to allow a jury to compare the requirements

of a specific 'standard' with appellees' conduct").  Likewise, Dr. Atlas's failure to point to any

- 12 -

specific standard or guideline concerning the use of mats at entrances renders it too vague to satisfy the requirements of D.C. law, and should be disregarded.  Because plaintiffs offers no other expert opinion to establish any standard of care or its violation, they cannot prove two of the elements of a negligence claim.

III.    **CONCLUSION**

Just because a person falls does not automatically mean that negligence occurred. Ultimately, plaintiff's own expert, Dr. Atlas, acknowledged both that it was not his professional opinion that the tile floor on which Mr. Frazza allegedly slipped was unsafe, and that the type of flooring used at that location was a "very commonly used material."  Exhibit 2 [Atlas Dep.] at 36-37.  He also admitted that the tile easily exceeded the only standard of care he identified with any precision: the coefficient of friction test of the ASTM No. 649 both when it was dry and when it was wet.  Furthermore, Dr. Atlas concedes that the use of tile did not violate any building code.  Id. at 54-55.  As such, there is no evidence whatsoever that the tile at the White House where Mr. Frazza slipped constituted a safety hazard or breached any standard of care. Because failure to establish a standard of care or its breach is "fatal to a negligence claim," Scott v. District of Columbia, 101 F.3d at 757, defendant is entitled to summary judgment in its favor.

Dated: May 18, 2007.

Respectfully submitted,

_____
JEFFREY A. TAYLOR, D.C. Bar # 498610
United States Attorney

  /s/
_____
RUDOLPH CONTRERAS, D.C. BAR #434122
Assistant United States Attorney

_____/s/_____

JANE M. LYONS, D.C. Bar # 451737
Assistant United States Attorney
555 4th Street, N.W. - Room E4822
Washington, D.C. 20530
(202) 514-7161
(202) 514-8780 (facsimile)