1

1  UNITED STATES DISTRICT COURT
   FOR THE DISTRICT OF COLUMBIA

2  _____

3  LUKE FRAZZA and MARY FRAZZA,    x
                                   :
4              Plaintiffs,         :
       vs.                         : CASE NUMBER:
5                                  : 06-1410 (CKK)
   UNITED STATES OF AMERICA,       :
6                                  :
               Defendant.          x
7  _____

8                      Miami, Florida

9                      Thursday, March 22, 2007

10

11  DEPOSITION OF:

12       RANDALL ATLAS, Ph.D.,

13  a witness, was called for examination by counsel

14  for the defendant, pursuant to Notice and agreement

15  of the parties as to time and date, beginning at

16  approximately 10:15 o'clock, a.m., taken at the

17  office of Atlas Safety & Security Design, Inc.,

18  770 Palm Bay Lane, Suite 4-I, Miami, Florida 33138,

19  before Judith M. Caputo, Registered Professional

20  Reporter and Notary Public in and for the State of

21  Florida, when were present on behalf of the

22  respective parties:

**CAROL J. THOMAS STENOTYPE**
**REPORTING SERVICES, INC.**
3162 MUSKET COURT
FAIRFAX, VIRGINIA 22030
(703) 273-9221

NCRA
NATIONAL COURT REPORTERS
ASSOCIATION

1    APPEARANCE OF COUNSEL:

2        For the Plaintiffs:

3            STEIN, MITCHELL & MEZINES, ESQUIRES

4            BY:  ARI S. CASPER, ESQUIRE

5            1100 Connecticut Avenue, N.W., Suite 1100

6            Washington, D.C.  20036

7            (202) 737-7777

8        For the Defendant:

9            UNITED STATES OF AMERICA

10           BY:  JANE M. LYONS, ESQUIRE

11           Assistant U.S Attorney, Civil Division

12           555 4th Street, N.W., Room E4822

13           Washington, D.C. 20530

14           (202) 514-7161

15                    -  0  -

16

17

18

19

20

21

22

1    it's my understanding that as he came through the

2    security checkpoint reflected on 1A, it went up the

3    driveway reflected in 1D.  That they walked up the

4    asphalt reflected in 2D, and you have a concrete

5    walkway reflected in 2A and C.

6            And then down a set of concrete stairs as

7    reflected in 3A, and also in 4D which actually shows

8    Mr. Frazza walking down the steps to show me how he

9    came across the property.  Coming into the foyer of

10    the building reflected in 3C.

11    Q.    So it's your understanding Mr. Frazza

12    arrived at the White House on January 23rd, 2005,

13    that is the route he took?

14    A.    Yes, ma'am.

15    Q.    Would it make any difference to you if

16    Mr. Frazza had been at work previously that day and

17    walked around the White House more than that?

18    A.    No, it wouldn't change my opinion.

19    Q.    Okay.  Fair enough.

20            Let's talk about what you did at the White

21    House on October 20th, 2006.  Your expert report

22    includes some calculations of the coefficient of

1    friction of the site where Mr. Frazza fell, right?

2        A.    Yes, ma'am.

3        Q.    Tell me how you came up with those

4    numbers.

5        A.    I brought a coefficient of friction slip

6    meter and conducted a series of tests on the tile

7    floor, a vinyl tile floor.  Tests were conducted dry

8    conditions -- you know, I cleaned the floor and you

9    conduct a series of tests with rubber booties on a

10   weight.  And then drag it and using a scale to

11   measure how much resistance that it takes to move

12   the weight with the rubber booties.

13       Q.    How much does the weight, weigh?

14       A.    The weight weighs five pounds.  In fact, I

15   printed for you, we can make this an exhibit.  This

16   is sort of the operating manual that comes with the

17   slip meter, so it gives the name brand of the slip

18   meter and how to actually conduct the test, and it

19   even has a little chart here about what's considered

20   safe or unsafe conditions.

21       Q.    Whose chart is that?

22       A.    That's the chart that came with the

1    instruction manual, for lack of a better word, for

2    the actual meter.  And that's consistent with -- I

3    also produced from American Society of Testing

4    Materials, a document called, "Walkway Surfaces

5    Measurement of Slip Resistance."  So I'm giving you

6    those two things.

7        Q.    Okay.  Had you used the horizontal slip

8    tester that you used at the White House prior to

9    using it at the White House?

10       A.    Yes, ma'am, I've used it on many

11   occasions.

12             I just wanted to finish answering your

13   previous question.

14       Q.    Go ahead.

15       A.    Which was, I conducted a test of dry

16   conditions, wet conditions, and then I conducted a

17   third test using some crushed ice.  I had like a bag

18   of ice in a baggie, and I crushed up some ice, and

19   put some ice on there, and conducted a test of what

20   the floor conditions might be if there was ice on

21   there.

22             So those are the three conditions I did.

27

1      You do a series of pulls on all four different

2      directions, and you average the pull between the

3      four pulls on any given dry, wet or icy surface.

4      And that was the coefficient of frictions that I

5      referenced in the document.

6          Q.   Do you have the data that you accumulated

7      at the White House?

8          A.   Yes, ma'am.

9              MS. LYONS:   Mr. Atlas, do you mind

10             if we make this Exhibit No. 2?

11             (Defendant's No. 2, Results of Slip

12             Test dated October 20, 2006, was marked

13             for Identification.)

14             MS. LYONS:   Back on.

15     BY MS. LYONS:

16         Q.   Mr. Atlas, we're looking at Defendant's

17     Exhibit No. 2 now, which I take it is the data that

18     you collected at the White House on October 20,

19     2006; is that right?

20         A.   Yes, ma'am.

21         Q.   Whose handwriting is this on the document?

22         A.   That's mine.

1   material itself, not necessarily what the condition

2   of the floor was on a day-to-day basis, where there

3   might be dust blowing in from the outside.

4       Q.    Okay.  So dust can make a difference in

5   the coefficient of friction?

6       A.    Yes, ma'am.

7       Q.    Wax can make a difference in the

8   coefficient of friction?

9       A.    Yes, ma'am.

10      Q.    Did Mr. Frazza tell you anything with

11  regard to the wax or dust conditions of the floor

12  when he fell?

13      A.    No, ma'am.

14      Q.    Did you conclude, based on your test, that

15  the vinyl flooring was an unsafe choice for the

16  place in which it was used?

17      A.    I did not make a decision that the vinyl

18  itself was an unsafe choice.  Vinyl is a very

19  commonly used material, not only in the D.C. area,

20  but especially here in South Florida, we've been

21  using it for years.  Vinyl can be risky when it gets

22  wet, depending on how it's treated, but I don't

1    think it was an unsafe choice by using vinyl tile.

2    It's a commonly used architectural material.

3        Q.    Okay.  When you did your wet test, how did

4    you go about adding moisture?

5        A.    What we do is, we have to use distilled

6    water, so I have a little bottle of distilled water

7    that I bring with me.  Assuming now that the floor

8    has been cleaned and wiped dry, and I've done my dry

9    test, I just add a little of the bottled water on

10   it, I rub around my fingers to evenly distribute it.

11       Q.    Approximately, how much water?

12       A.    I would say probably two, three ounces.

13       Q.    Over what area, surface area?

14       A.    About a six-square inch area.

15       Q.    And you smooth it around with your hand?

16       A.    Yes, ma'am.  Actually, on the CD that was

17   given to you by the photographer, there was some,

18   actually, good picture documentation of me doing the

19   test.  So it shows what I'm doing, but just to

20   recapture it in verbal form, I was essentially

21   testing a square -- let's see a picture that shows

22   that.  The professional photographers pictures show

39

1     Q.    The same with the snow or ice, icy

2     conditions that you tried to replicate, correct?

3     A.    Yes, ma'am.

4     Q.    In your report, you say that the dry

5     surface has a coefficient of friction of 0.57?

6     A.    Yes, ma'am.

7     Q.    Are there units of measurement that go

8     with the coefficient of friction?

9     A.    Would you be clearer with the question?

10    Q.    Well, I'm not much of a scientist myself.

11    I remember getting things marked wrong in physics

12    when I gave answers like 0.57.

13    A.    I think that's -- I think that's answering

14    your question, is there a standard about what

15    becomes slippery and what's not slippery; is that

16    what your question is?

17    Q.    No.  My question is 0.57 what?  Newtons,

18    pounds --

19    A.    Pounds.

20    Q.    Pounds.  And what do you divide?  Do you

21    divide weight by force both measured in pounds?

22    A.    Let me see if I can -- well, that's

48

1    statistics books to go back and do it.  Essentially,

2    you're just looking at the variation from -- I did

3    it when I was doing my dissertation, I had to look

4    at standard deviation.

5        Q.    When did you do your dissertation,

6    Mr. Atlas?

7        A.    1983.

8        Q.    Is it fair to say then that's the last

9    time you looked at statistics?

10       A.    No.  Because I actually conduct research

11   on a regular basis afterwards for my criminology --

12   for doing crime stat analysis.

13       Q.    Oh, okay.  But you didn't do any

14   statistical analysis of the data in this case,

15   right?

16       A.    No.  The data stands self apparent for

17   what it is.

18       Q.    I'm looking now at the last page of what

19   we have marked as exhibit number three which is a

20   chart.

21       A.    Yes, ma'am.

22       Q.    It's called walkway condition table.  Is

49

1    this chart particular to indoor services as opposed

2    to outdoor services?

3        A.    It applies to either.    In the literature,

4    which is has been voluminous in nature, the standard

5    of care for slip resistance is somewhat universal.

6    Meaning, when you hit that point five mark, and you

7    go below the point five, it's considered slippery.

8    And as an example of that, too, it's even referenced

9    in the American Disabilities Act which is, you need

10   to have a firm and stable surface and some of the

11   notations deep into the ADA talk about the standard

12   of care, that materials below point five are

13   considered slippery.

14        So, whether it be an exterior sidewalk or

15   be an interior lobby for a

16   convenience store, really doesn't matter.    The

17   scale, you know, zero to one applies universally in

18   that realm.

19        Q.    So anything above point five on this

20   chart, is labeled as very safe; do you agree with

21   that?

22        A.    Yes, ma'am.

1      Q.    And below that, there are various degrees

2   of safety?

3      A.    Yes, ma'am.

4      Q.    For the dry test that you conducted you

5   found a coefficient of friction of point 57 so that

6   would be safe, correct?

7      A.    Yes, ma'am.

8      Q.    Now, you only gave one wet coefficient of

9   friction and that's for 0.32.  And you have three

10  sets of data, so which points did you use to come up

11  with the point 32?

12     A.    So.  I was having a moment.

13          It was using the ice data not just the

14  water.

15     Q.    So point 32 includes --

16     A.    And, actually, it ranges from point three

17  to point four.  So you would average of the four

18  pulls, it would be between point three and point

19  four.  So it would be about point 35.

20     Q.    What would be about point 35?

21     A.    The coefficient of friction, when I did

22  the test for ice.

1      Q.    Okay.   What is it for, just wet?

2      A.    It averages actually point 85.   It was

3  actually more slip resistant, and my explanation for

4  that is, that sometimes when you do these

5  coefficient of friction tests and they have the

6  rubber booties, the way -- they sort of feel almost

7  like a little vacuum or suction, so it actually sort

8  of -- with the water, and it sort of actually showed

9  more slip resistance with the wet conditions.

10     Q.    I want to make sure I understand,

11  Mr. Atlas.

12           Are you saying the coefficient of friction

13  for the wet test that you conducted was point 85?

14     A.    Yes, ma'am.

15     Q.    How come you didn't include that in your

16  report, you didn't think that was important?

17     A.    It was -- it was just -- I figured almost

18  an anomaly it was unusual to find where the

19  coefficient of friction when it was wet was actually

20  greater than when it was dry.

21     Q.    But you testified that it's possible?

22     A.    Yes.

1      Q.    Did you think your data was flawed?

2      A.    No.   I conducted the test and rechecked my

3   results and when it was wet, the vinyl tile has a

4   quality about it that, actually, this particular

5   vinyl tile was gripping the rubber booties and not

6   letting go.

7      Q.    So in your report when you said that the

8   coefficient of -- well, you say a wet coefficient of

9   friction of 0.32 that's inaccurate, correct?

10     A.    For -- actually, it would be wet with the

11  ice.  What I didn't say --

12     Q.    You combined the data?

13     A.    Correct.

14     Q.    Okay.

15     A.    Sorry, I wasn't clear on that.

16     Q.    That's okay.  Glad we got it cleared up.

17  Point 85 falls well in the safe range; is that

18  correct?

19     A.    Yes, ma'am.

20     Q.    I want to be clear on a couple of things

21  you talked about.  Let's talk about the ADA

22  Standards first.

54

1   preparations and the whole food industry, that is

2   very important.  So that's why there's been such a

3   wide range of testing of shoe materials as well as

4   floor materials and often the interaction between

5   the two.

6           So the American Society of Testing

7   Materials is probably your single source of

8   literature and/or testing standards, and/or

9   standards of care, that the other major publications

10  used as a reference point.  For example, ADA,

11  American Disabilities Act, and the National Fire

12  Protection Association, Life Safety Code and all the

13  other major sort of building codes that use stable

14  and firm surfaces and those kind of wordings, and

15  the 0.5 is the threshold.  That all stems back to

16  the ASTM tests.

17      Q.   Okay.  Did you make any analysis about

18  whether the vinyl flooring where Mr. Frazza fell

19  violated any building codes?

20      A.   I'm comfortable in stating that it did not

21  violate any building codes.  I didn't do any

22  specific code comparison of D.C. codes, but I'm

1    familiar with the northern codes as well as I'm

2    familiar with the building codes in the United

3    States, because I've compared the codes from north,

4    south, east, west.  And there's nothing inherently

5    wrong with the floor material.

6         Q.   Did Mr. Frazza indicate to you when he

7    fell that there was ice on the floor?

8         A.   He did not specifically state that there

9    was ice on the floor, he did not look at the floor

10   when he stepped in, so he was not aware of any

11   conditions that were on that floor prior to him

12   stepping on it.

13        Q.   Mr. Atlas, you're not certified as an

14   accident reconstructionist, are you?

15        A.   No, ma'am.

16        Q.   Have you had training in that regard?

17        A.   No, ma'am.  I am registered with the --

18   I'm a member of the human factors and Ergonomics

19   Society and I am registered as an architect.

20        Q.   Let's talk a little bit of the human

21   factors that is involved when somebody slips and

22   falls.

1       surface, the material that produced the

2       coefficient of friction, and that's why I

3       need to sort of get that train of thought

4       out.  So it was how I connected the dots.

5   BY MS. LYONS:

6       Q.   So your assumption is that Mr. Frazza

7   brought in the material that caused him to slip?

8       A.   I'm saying it's a very good likelihood.

9   Because I don't have any information on who walked

10  before him.  It's a possibility that others have

11  walked before him had already come in the floor and

12  done the same exact thing.  And maybe had deposited

13  some ice and snow.  And, also, the possibility that

14  with the door being open, that snow or ice could

15  have been blown in.  So this is the immediate

16  door -- this is the immediate foyer as the door

17  opened to this area.  Which was subject to, you

18  know, wind and the elements coming in.

19          So, is it possible and probable that

20  outside elements could have been blown in in this

21  particular foyer area?  Yes.  I don't have any

22  particular knowledge of it, so I can't attest to

1    that with certainty.  However, I am very comfortable

2    attesting with a very high level of probability,

3    that within Mr. Frazza's own shoes, he was carrying

4    stuff with him.  Does that make sense?

5         Q.   Yes.  That makes sense.

6              What it sounds to me that you're saying is

7    that the accident was foreseeable by Mr. Frazza?

8              MR. CASPER:  Objection to form.

9              THE WITNESS:  No, I disagree.  As

10             stated earlier, I think it was reasonable

11             that Mr. Frazza expected that when he

12             came from the cold, and the wet, and the

13             ice and the snow, as he stepped inside

14             this foyer, his expectation was to hit a

15             walking, a stable and firm surface.

16   BY MS. LYONS:

17        Q.   Would that be covered with a mat?

18        A.   Yes, ma'am.

19        Q.   What did Mr. Frazza tell you about his

20   experience with mats in that exact location?

21        A.   If I'm understanding the question clearly,

22   what Mr. Frazza told me is that when he walked into

1          So, but for the purposes of the

2     hypothetical, if in fact there had not been mats

3     before, and there really wasn't going to be mats in

4     the future, and he had been familiar with the

5     environment without their ever being mats, then,

6     yes, I think that it does change the attitude

7     because he was familiar.  This is not the first time

8     in that space, and he had been used to that space

9     without having a mat on top of the vinyl surface

10    under adverse weather conditions.

11          MS. LYONS:  Why don't we take our

12       quick break?

13          (Thereupon, a brief recess was

14       taken.)

15          MS. LYONS:  All right.  Back on the

16       record.

17    BY MS. LYONS:

18       Q.    There's a reference in your report,

19    Mr. Atlas, to observing mats and warning cones

20    during your visit to the Washington D.C. area in

21    October of 2006?

22       A.    Yes, ma'am.

1          Q.    Tell me everything that you meant to

2    include by that reference.

3          A.    Part of what I was trying to establish in

4    my own mind's eye and from my experience in coming

5    up to D.C., I've come up to D.C. for many years for

6    different conferences I speak at.  So I'm familiar

7    with New York, D.C. and Baltimore.  I speak

8    regularly at national conferences and conventions

9    around the country.

10              In my site visit in October of 2006, it

11   had been raining that particular afternoon when I

12   had gone to Mr. Casper's office for my pre-site

13   visit preparation.  And as I walked around the

14   different -- I was staying at a hotel not too far

15   from there, and Mr. Casper's office is not too far

16   from the White House.  So we're talking geographic

17   proximity of that area of Washington D.C. that's

18   give or take a quarter half mile radius of the White

19   House and those office buildings.

20              I don't want to say every -- but it would

21   appear that on the route that I went, every single

22   office building that had a lobby foyer, had a mat

1    down and typically had the cones saying, you know,

2    the little yellow cones and picture of someone

3    slipping, you know, and pay attention.

4              And it just reaffirmed the fact that it's

5    standard practice in the northeast that when you

6    have wet conditions because especially in the east,

7    office buildings where there's very nice

8    architectural materials on the floor, sometimes

9    marble granite or things of that nature, that it is

10   standard practice to put down mats and do the cones.

11   And so I just wanted to reaffirm the fact that this

12   wasn't a fluke thing, that in fact -- and this is

13   before I had the government's exhibits of policies

14   and procedures, so I was sort of in the dark of what

15   was your standard of care within government

16   practice, whether it be GSA buildings and/or the

17   White House which is part of the GSA family network.

18        Q.    Yeah, that's a problematic phrase.  What

19   do you base that statement on?

20        A.    GSA is the administrative arm for all the

21   Federal Government buildings, and the White House

22   being one of the Federal Government buildings.  As

1    of Mr. Casper's office building, did you look at

2    every entrance to the building to see if there were

3    mats and cones?

4        A.    Of the press area or the White House

5    generically?

6        Q.    No.  I'm asking you about your hotel that

7    you left and Mr. Casper's office building.  Did you

8    look at every entrance and exit?

9        A.    No, ma'am.

10        Q.    Do you have any familiarity with what the

11    practice, or custom, or standard of care is in

12    buildings for employee entrances?

13        A.    In regards to accessibility I do, yes.

14        Q.    What about with regard to the placement of

15    mats and cones?

16        A.    Not necessarily.

17        Q.    Okay.  In your experience, is it common

18    for there to be a difference in areas where the

19    public is expected to traverse as opposed to areas

20    not commonly used by the public?

21        A.    Sometimes.  They're handled differently.

22        Q.    You talked about the materials reviewed

104

1    they're in an employee capacity --

2        Q.    But not by the White House.  You didn't

3    mean to suggest that the snow and ice that came in

4    was only --

5        A.    By White House employees.

6        Q.    -- by White House employees?

7        A.    No, I didn't.  That was not my intention

8    there.

9        Q.    In fact, as I understand your testimony,

10   you think the majority of the people who used that

11   doorway are probably reporters?

12       A.    Workers, but not white houseworkers but --

13   I'm not sure what word we should use for our

14   reporters and photographers and those collective

15   pool of workers.

16       Q.    At the beginning of your report on page 1,

17   maybe, maybe not.  Do you consider Washington D.C.

18   to be in the northeastern United States?

19       A.    Yes, ma'am.

20       Q.    What is that based on?

21       A.    It's on the eastern -- just my

22   understanding of the geography of the United States

1    and the weather conditions and, um, you know, it's

2    definitely not the midwest, and it's not the

3    southeast.  And there's a whole bunch of snow that

4    you don't get from North Carolina.  The southeast

5    would be considered North Carolina south.

6         Q.   So you wouldn't put Virginia in the

7    southeast?

8         A.   Virginia is sort of our buffer state of --

9         Q.   This is all just based on your

10   understanding of the geography of the United States?

11        A.   Yes, it's based on my understanding.

12        Q.   With your perspective of a man living in

13   Miami, Florida?

14        A.   Yes.  It's a lot further north.

15        Q.   I noticed on your CV that I think you're

16   the author of something called a "Slip and Fall

17   Primer" --

18        A.   Yes, ma'am.

19        Q.   -- from Florida Architect Journal from

20   July, 1987?

21        A.   Yes.  I wrote a series of publications

22   that were published in our state architectural