# EXHIBIT 6

DEPOSITION OF DORIE TAYLOR
CONDUCTED ON TUESDAY, JANUARY 30, 2007
Case 1:06-cv-01410-CKK Document 13-4 Filed 06/01/2007 Page 2 of 8

1 (Pages 1 to 4)

**1**

1    IN THE UNITED STATES DISTRICT COURT
2        FOR THE DISTRICT OF COLUMBIA
3    - - - - - - - - - - - - - - - X
4    LUKE FRAZZA, et al.,        :
5        Plaintiffs,    : Civil Action No.:
6    vs.        : 06-1410 (CKK/JMF)
7    UNITED STATES OF AMERICA,    :
8        Defendant.    :
9    - - - - - - - - - - - - - - - X
10
11        Deposition of DORIE TAYLOR
12            Washington, D.C.
13        Tuesday, January 30, 2007
14            12:12 p.m.
15
16
17
18
19
20   Job No.: 1-95874
21   Pages:  1 - 98
22   Reported by: Dana C. Ryan, RPR

**2**

1        Deposition of DORIE TAYLOR, held
2    at the law offices of:
3        Stein, Mitchell & Mezines, L.L.P.
4        1100 Connecticut Avenue, N.W.
5        Suite 1100
6        Washington, D.C. 20036
7        (202) 737-7777
8
9
10       Pursuant to agreement, before Dana C. Ryan,
11   Registered Professional Reporter and Notary Public
12   in and for the District of Columbia.
13
14
15
16
17
18
19
20
21
22

**3**

A P P E A R A N C E S

ON BEHALF OF THE PLAINTIFFS:
    ARI S. CASPER, Esquire
    Stein, Mitchell & Mezines, L.L.P.
    1100 Connecticut Avenue, N.W.
    Suite 1100
    Washington, D.C. 20036
    Telephone: (202) 737-7777


ON BEHALF OF THE DEFENDANT:
    JANE M. LYONS, Esquire
    Assistant United States Attorney
    U.S. Attorney's Office
    555 4th Street, N.W.
    Room E4822
    Washington, D.C. 20530
    Telephone: (202) 514-7161

    - and -

**4**

    CLAIRE A. WATKINS, Esquire
    Assistant Regional Counsel
    Office of Regional Counsel
    National Capital Region
    U.S. General Services Administration
    307 7th & D Street, S.W.
    Suite 7048
    Washington, D.C. 20407
    Telephone: (202) 708-3295

**Page 5**

CONTENTS

EXAMINATION OF DORIE TAYLOR:                     PAGE:
By Mr. Casper                6
By Ms. Lyons                 93

EXHIBITS

(Retained by Counsel)

TAYLOR DEPOSITION EXHIBIT                PAGE
No. 1    Defendant's Objections And           64
         Responses To Plaintiffs' First
         Set Of Interrogatories
No. 2    Photograph                           73
No. 3    Photograph                           79
No. 4    Photograph                           84
No. 5    Photograph                           86
No. 6    Photograph                           91

**Page 6**

PROCEEDINGS

DORIE TAYLOR,

having been duly sworn, testified as follows:

EXAMINATION BY COUNSEL FOR THE PLAINTIFFS

BY MR. CASPER:

Q   Good morning. How are you?
A   Good morning.
Q   Could you spell your name, please?
A   Dorie, D-O-R-I-E.
Q   D-O-R-I-E?
A   Yes, Taylor, T-A-Y-L-O-R.
Q   And where are you from?
A   Washington, D.C.
Q   You grew up in Washington?
A   Yes.
Q   Where did you grow up?
A   I grew up in Southeast, Northeast.
Q   Did you go to school in Washington, D.C.?
A   Yes.
Q   Where did you go?
A   I went to Houston Elementary School. I went to Roper Junior High. I went to Martha Washington,

**Page 7**

and I went to Spingarn.
Q   Did you graduate from Spingarn?
A   No, I didn't.
Q   How far did you go?
A   I went up to the 11th grade.
Q   Do you remember around the year when you finished 11th grade?
A   Oh, not offhand. I can't really remember right now.
Q   What year were you born?
A   1953.
Q   Where do you live now?
A   Greenbelt.
Q   You live in Greenbelt where?
A   6612 Lake Park Drive.
Q   Where is that?
A   In Greenbelt.
Q   I mean where in Greenbelt?
A   Right off of BW Parkway.
Q   Uh-huh.
A   Yeah, not too far from the NASA center.
Q   Now, when you finished 11th grade, what did

**Page 8**

you do?
A   When I finished the 11th grade, I worked at carry out for a while. Then I went -- yeah, carry out for a while.
Q   Carry out for --
A   Fast food, fast food place, yes, sir.
Q   Which place?
A   The name of it was TNT Carry Out.
Q   How long did you do that?
A   About -- really about 17, 18 years, I think.
Q   What was your position there?
A   My position was a cashier, and I fixed fast food for, you know, customers.
Q   So you cooked the food?
A   Cooked.
Q   And sold the food?
A   Sold food, yes.
Q   Did you have any role in the maintenance of the place?
A   No, sir.
Q   What about when you left TNT?
A   I went to Canteen -- Canteen was in the Old

DEPOSITION OF DORIE TAYLOR
Case 1:06-cv-01410-CKK   Document 24-2   Filed 06/01/2007   Page 4 of 8
CONDUCTED ON TUESDAY, JANUARY 30, 2007

13 (Pages 49 to 52)

---

**49**

1   A   No, huh-uh.

2   Q   You were the top?

3   A   Yeah.

4   Q   All right.

5   A   Of the custodial shop, uh-huh.

6   Q   Okay. I want to talk to you about the press

7   area.

8   A   Uh-huh.

9   Q   And this is all preconstruction, all right?

10   A   Right.

11   Q   Okay. And I want to focus on the

12   January 2005 time frame, and if there's anything

13   remarkable that's, you know, changed before the

14   construction, you can tell me. But generally

15   speaking, has the press area remained the same for a

16   while?

17   A   Yes. Uh-huh.

18   Q   All right. Describe the press area.

19   A   The front or the back? I mean, you want the

20   whole -- from the briefing all the way through the

21   back or just --

22   Q   I'd like you to take me through when you

---

**50**

1   come down the steps from the front lawn coming in that

2   side entrance.

3   A   The back of the press, okay. The back of

4   the press -- before the construction, it was something

5   blue covered up -- it was something blue covered up

6   with press equipment by the door.

7   Q   How long had that stuff been there?

8   A   Centuries. Believe me, a long time. I

9   think they would uncover it when they used it, and

10   they cover it back up in case if the weather was bad

11   or something like that. It's been there for a long

12   time.

13   Q   All right.

14   A   And then the door; then there's a little

15   hallway, steps going to your left going down; and

16   before you get to the second door, there might have

17   been a black carpet there, the door, trash can,

18   vending machines -- vending machines is on the right

19   side coming in -- table, chair, three doors to three

20   different bathrooms, ladders --

21      MS. LYONS:  Ladders?

22      THE WITNESS:  Well, the press area have

---

**51**

1   ladders, you know, everywhere.

2      Ladders, refrigerator, go around,

3   cappuccino machine, about two microwaves, I think, or

4   one microwave, then the trash can. I mean --

5   BY MR. CASPER:

6   Q   And then the desks would be in the back

7   area, or what you would call the front?

8   A   No, the desks would be once you go around

9   the corner.

10   Q   All right.

11   A   Right. Uh-huh.

12   Q   Now, you said that there might have been a

13   black carpet at the front of that door?

14   A   It might have been, yeah, uh-huh -- no, in

15   between.

16   Q   In between the door where you come in to

17   the -- from the outside --

18   A   Outside, right.

19   Q   -- and into the press room?

20   A   Right.

21   Q   Describe the black carpet.

22   A   What's -- it might have been ridges -- if it

---

**52**

1   was down there, it had to be ridges, you know, like

2   lines -- it wasn't a straight carpet. It was like

3   lines on the -- black with lines.

4   Q   Black with lines?

5   A   Black with little ridges, yes.

6   Q   All right. And how big was it?

7   A   It was about that (indicating).

8      MS. LYONS:  This (indicating) part of

9   the table?

10      THE WITNESS:  Yeah. Uh-huh. It was

11   about eight by six something. It wasn't a big one,

12   because you can't put but so big. It was probably

13   eight by six or five by six.

14   BY MR. CASPER:

15   Q   All right. And you said it -- you said

16   twice now "it might have been" there or "if it was

17   down." What does that mean?

18   A   What that means is that people have moved

19   it, so if -- if some -- if people are -- if somebody

20   is in a hurry to get through or running or whatever or

21   rolling something out, they will move the carpet.

22   Q   Where would they move it to?

---

53

1    A    I've seen them move it; they put it on the
2    side, in front -- you know, throw it in front of
3    the -- in front of the vending machines or just lay it
4    up by the wall or something like that.
5        Q    So your testimony is that in January of 2005
6    the regular practice was to have that black carpet
7    there?
8        A    Yes, sir, I think so. Yes, if it was there
9    that day.
10       Q    Well, what do you mean "if it was there that
11   day"?
12       A    If -- the only way it wasn't there is if
13   somebody moved it, because I've seen the -- I've seen
14   the carpet moved, put back, moved, you know, like
15   that, so if it was moved. Other than that, it would
16   have been right there in that door space.
17       Q    And where is the carpet today?
18       A    I don't know. I don't know -- I don't know
19   what they did with anything that was in the press
20   area --
21       Q    Uh-huh.
22       A    -- once the construction started.

54

1        Q    Was the black carpet ever cleaned?
2        A    No, because it's like that indoor/outdoor
3    carpet.
4        Q    Uh-huh.
5        A    I don't think those are cleaned too often.
6        Q    So it just sat right in front of the
7    entrance way to the press room between the two doors?
8        A    Right.
9        Q    And whose responsibility was it to make sure
10   that the carpet was there?
11       A    There's nobody's responsibility to make sure
12   the carpet is there. Even if you scrub or sweep the
13   floor or even if you wax the back of that section,
14   when that floor is dry, you have to put it there
15   because Secret Service is in and out the door
16   themselves, too.
17       Q    So why do you have to put it there?
18       A    Because it's an entrance where if the
19   weather is bad -- and they have -- all the entrance
20   over there, they have carpet. In all the entrance --
21   it's carpet in all the entrances.
22       Q    Okay. So you were saying if the weather's

55

1    bad?
2        A    If the weather's bad -- or even if it's
3    good. If it's sunny out there, that carpet is
4    supposed to be sitting right there on that floor.
5        Q    Is the carpet there for bad weather?
6        A    No, it's just there.
7        Q    It's just there?
8        A    It's just there, uh-huh.
9        Q    And you said every entrance way in the
10   entire White House facility has carpet?
11       A    It has carpet at every entrance, uh-huh.
12       Q    So if there wasn't carpet in that entrance
13   way, that would be unusual?
14       A    I think it would be unusual. It's no way in
15   the world that carpet shouldn't have been there. The
16   carpet should have been there.
17       Q    I'm sorry. I didn't hear you.
18       A    I say it's not unusual because the carpet
19   should be there. You know, it shouldn't be moved.
20   It's nowhere to move it. That's the only place -- the
21   only entrance leaving out the back is right there.
22       Q    So there's no place to move the carpet to?

56

1        A    And lay it somewhere else, no, sir, it's
2    not.
3        Q    What about to roll it up and put it
4    somewhere?
5        A    I've seen the press people roll it up and
6    put it on the side of the wall if they running out
7    with -- what's those dollies or -- yeah, the dolly
8    trucks.
9        Q    You've seen press people move the --
10       A    Yes, I have.
11       Q    Just let me finish the question, please.
12       A    Okay. I'm sorry.
13       Q    You've seen them move the mats?
14       A    Uh-huh.
15       Q    Or the carpet?
16       A    Uh-huh.
17       Q    That's a yes?
18       A    Yes.
19       Q    And what do you do when you see that they
20   moved the carpet?
21       A    When I -- I have stood back, because I know
22   they in the hurry to get over there where the

57

1  president is. Once they've gone past, I've laid the
2  carpet back down. I've come back and the carpet is
3  back up again. I've seen that before, uh-huh.
4      Q   And why do they do that?
5      A   I think the -- the carpet is not a flat
6  carpet. You know, the indoor/outdoor is a little
7  puffy or something, and I guess to roll your stuff
8  over quickly -- they have to roll it out and go around
9  like this (indicating).
10     Q   Did you ever tell -- in the January 2005
11  time frame, did you ever tell any of the press members
12  not to move the carpet?
13     A   That's not my -- that's not my
14  responsibility.
15     Q   Whose responsibility is it?
16     A   It's not mine. I don't know. It's not
17  mine.
18     Q   Well, you've said that on the weekends
19  you're the top person for the custodial staff?
20     A   Right. But it's not my responsibility --
21  see, it's not my responsibility to tell any of --
22  anybody's staff or any kind of staff what to do. The

58

1  only people that I'm supposed to ask to -- and tell
2  what to do is the custodial shop, not anyone else.
3  What I'm saying is, if you do something in there that
4  you shouldn't do, that myself or my staff is supposed
5  to come back and clean it up. And we know that it's
6  wrong for them to do it. Truly, you don't want to go
7  and tell nobody in the staff, excuse me, don't move
8  that anymore. You don't do that.
9      Q   You just wouldn't tell the press --
10     A   You don't tell anybody, no, sir, you don't.
11  Huh-uh.
12     Q   On a given Sunday how often would you say
13  somebody from the press would move this black carpet?
14     A   Given --
15         MS. LYONS: Objection, foundation.
16  Just one second. She can only testify as to what she
17  might have seen.
18         MR. CASPER: Well, obviously.
19         MS. LYONS: You can answer.
20         THE WITNESS: In the time that the
21  press people have been there and I have been in charge
22  of cleaning the East and West Wing, really, I'll give

59

1  it -- not day-to-day, but I'll give it -- I've seen
2  them move it at least 50 times, 40 or 50 times, I
3  have, yes, sir.
4  BY MR. CASPER:
5      Q   And was that a problem? Did you view that
6  as a problem?
7      A   No. I mean, we're there to serve each and
8  every person there at the White House. No, sir.
9      Q   But the fact that there wouldn't be a carpet
10  in front of the door, did you view that as a problem?
11     A   No, because we're servicing at a regular
12  basis until -- when they move it, we just put it right
13  back down there, you know. We don't -- we -- on our
14  job, we don't, like, you know, sweat, sweat, because
15  our job is -- we keep it up really well. So if you
16  see somebody where they have moved the carpet or moved
17  something that they shouldn't have moved, it's really
18  no big deal because that's what we are there for, you
19  know. And, you know, it's a saying that if you don't
20  want to do your job, somebody else will come in and do
21  it, and I've heard that, you know, I mean . . .
22     Q   What's your understanding of the purpose of

60

1  the black carpet?
2      A   The understanding -- all I know is that the
3  carpet is down there -- be down on the floor. The
4  purpose, if it's good weather, bad weather, the carpet
5  is there. I -- you know, if the -- if the floor is
6  wet and somebody is coming in -- if the floor is wet
7  from the outside, the ground is wet from the outside,
8  that's just like if you were at home, you would brush
9  your feet over that carpet before you walk into a dry
10  space because you wouldn't -- I mean, we have people
11  there that sweep, scrub, wax and buff that floor back
12  there where they eat at. I mean, nobody want to eat
13  in a nasty place, so, really, we try to keep that
14  floor clean as possible for the people that have to
15  use their little eat-in section area. And if the
16  weather is bad, I've seen many people take their feet,
17  brush it and then walk on. I've seen some people just
18  walk past and don't brush their feet, you know.
19     Q   Did you ever come to work and see that the
20  black carpet wasn't there?
21     A   I can't remember, no, sir. I really can't.
22     Q   Were you ever there when the floor in the

**61**

1  front -- or the entrance area of the press area was
2  mopped? I'm assuming that's how they cleaned it was
3  to mop it.
4      A    They did that at night. You mean -- talking
5  about scrubbed the whole floor?
6      Q    Right.
7      A    All that's done at night.
8      Q    Were you ever there for that?
9      A    No. Huh-uh.
10     Q    Do you know whether they mopped the floor
11  under the black carpet?
12     A    Mopped the floor under the black --
13     Q    Right.
14     A    Mopped the floor under, so you mean move the
15  mop -- move the black carpet to mop under it?
16     Q    Right.
17     A    That's what they supposed to do.
18     Q    How do you know that's what they're supposed
19  to do?
20     A    Because they're supposed to clean the whole
21  floor. They're supposed to put the chairs -- all the
22  chairs -- they got ten, 12 chairs back there. You're

**62**

1  supposed to move the chairs off the floor, move the
2  trash cans from around the area. Everything that's on
3  that floor, you're supposed to move. And when they --
4  when the Secret Service unlock that door the next
5  morning, it's supposed to be -- everything is supposed
6  to be sitting right back down on that floor.
7      Q    Who was on the night crew back in
8  January 2005?
9      A    Ms. Clayton is the night assistant foreman.
10     Q    What's her first name?
11     A    Sheree, S-H-E-R-E-E.
12     Q    She's responsible for that area?
13     A    Yes, sir. She's the assistant foreman. We
14  have Ms. Joan Barnes. She is in the -- she is the
15  supervisor.
16     Q    Was Ms. Clayton in that capacity in January
17  of '05?
18     A    Ms. Barnes take cares of the room.
19  Ms. Clayton is the assistant foreman. Ms. Clayton is
20  the night assistant foreman. Ms. Barnes is the
21  immediate supervisor for the West Wing.
22     Q    Okay. Were they both in the -- working in

**63**

1  those jobs in January of '05?
2      A    They were in that job -- in those jobs, yes,
3  sir.
4      Q    Are you able to read at all without your
5  glasses?
6      A    Yes, sir.
7      Q    You testified earlier that you had seen the
8  defendant's objections and responses to the
9  plaintiffs' first set of interrogatories?
10     A    The what?
11     Q    This document I showed you before.
12     A    Right. Uh-huh.
13     Q    And Ms. Lyons asked you questions about them
14  and you provided answers?
15     A    Yes, sir.
16     Q    And you signed attesting that what you told
17  her was correct?
18     A    Yes, sir.
19     Q    Did you read them from cover to cover?
20     A    Yeah.
21     Q    You did?
22     A    Uh-huh.

**64**

1          MR. CASPER: Can you mark this, please?
2      (Taylor Deposition Exhibit Number 1 was marked
3  for identification and retained by Counsel.)
4  BY MR. CASPER:
5      Q    I'm showing you what I've marked as Taylor
6  1. That's what I showed you a few minutes ago; do you
7  remember that?
8      A    Yes.
9      Q    Show me in there where there's any mention
10  at all of a black carpet.
11     A    (Witness reviews document.) When she
12  mentioned the black -- asked me about a carpet, I told
13  her -- and the reason probably why it's not in here is
14  because I told her there was supposed to be a black
15  carpet down there, and that if it wasn't, I don't
16  remember that day. That's why if it's not in here --
17  I don't remember if a black carpet was down there, but
18  it should have been one down there. And the only
19  reason why it wasn't, if it wasn't down there, is
20  because someone had moved it, and that's why --
21  there's no black carpet in this, and that's why it's
22  not in here, because when she asked me that, I said to

**65**

1 her, it should have been a black carpet down there,
2 and I have seen the press people move the black carpet
3 to get out of the back of the -- the back of the
4 building. I have seen that. So if it's not in here,
5 it's because she didn't put it in here.
6     Q  So you don't know whether there was --
7 whether the black carpet was down or not on
8 January 23rd, 2005?
9     A  I don't remember the 23rd. I really don't.
10     Q  So the answer is you don't remember if there
11 was a black carpet down there?
12     A  No, sir, I don't remember.
13     Q  Now, tell me, coming down the steps from the
14 front lawn -- you know what I'm talking about?
15     A  Uh-huh.
16     Q  All right. Describe the path from the front
17 of those steps into the press area that we're talking
18 about.
19     A  Describe it?
20     Q  Yeah.
21     A  The steps -- I think it was a gate up there;
22 there's a gate up at the top of the steps. Come down

**66**

1 so many steps -- I don't know how many steps -- and
2 then you walk like this (indicating) and you walk
3 around like that (indicating).
4     Q  So, for the Record, you go straight and then
5 you make a right?
6     A  You go straight; you go down; you go
7 straight, and then you make a right, yes.
8     Q  And on the left there's a booth there, isn't
9 there?
10     A  No, there's a booth straight.
11     Q  Straight ahead?
12     A  Straight ahead.
13     Q  And who is in the booth?
14     A  Secret Service.
15     Q  And are they there at all times?
16     MS. LYONS: Ari, let's not go too far
17 down this line. You've got sensitive areas of
18 security on some of these issues. I understand. I
19 think you're okay right now, but we may have to get a
20 protective order for this part of the deposition.
21     MR. CASPER: I'll ask. If -- you
22 object if you need to object, if you want to.

**67**

1     MS. LYONS: I think you're okay so far,
2 but you're getting close.
3     THE WITNESS: So you said what now,
4 sir?
5 BY MR. CASPER:
6     Q  Is there somebody from the Secret Service
7 there at all times?
8     A  When I pass through there, I've seen them
9 there.
10     Q  Are there surveillance cameras in the area?
11     A  I don't know about all that. I don't know
12 about all that.
13     Q  Who does know?
14     A  Secret Service.
15     Q  You've never seen any surveillance cameras
16 in that area?
17     A  Really, sir, I never looked. We are not
18 supposed to look and see where we see a camera or
19 anybody dealing with Secret Service.
20     Q  Have you been instructed not to look for
21 cameras?
22     A  We've been instructed to do our job and

**68**

1 leave everybody else's business alone.
2     Q  What about in the press area; are there
3 cameras in the press area?
4     A  I don't know. I really don't. I don't know
5 where they are in that complex.
6     Q  Okay. Describe the -- we'll call it the
7 Secret Service booth?
8     A  Uh-huh.
9     Q  Okay. Describe the Secret Service booth.
10     A  Okay. This is -- this (indicating) is the
11 press door. There's a glass right there (indicating)
12 a long glass -- it's an open glass area all the way
13 around, and the door. That's it.
14     Q  Okay. And how many Secret Service officers
15 are usually stationed in there?
16     MS. LYONS: Objection, law
17 enforcement --
18     THE WITNESS: I don't know.
19     MS. LYONS: She doesn't know. I can't
20 let her answer even if she did.
21     MR. CASPER: Why don't we go off the
22 Record for a minute.