# EXHIBIT 7

📄 **COPY**

1

1          UNITED STATES DISTRICT COURT
           FOR THE DISTRICT OF COLUMBIA
2          ─────────────────────────────────

3      LUKE FRAZZA and MARY FRAZZA,     x
                                         :
4                    Plaintiffs,         :
           vs.                           : CASE NUMBER:
5                                        : 06-1410 (CKK)
       UNITED STATES OF AMERICA,         :
6                                        :
                     Defendant.          x
7          ─────────────────────────────────

8                           Miami, Florida

9                           Thursday, March 22, 2007

10

11     DEPOSITION OF:

12           <u>RANDALL ATLAS, Ph.D.</u>,

13     a witness, was called for examination by counsel

14     for the defendant, pursuant to Notice and agreement

15     of the parties as to time and date, beginning at

16     approximately 10:15 o'clock, a.m., taken at the

17     office of Atlas Safety & Security Design, Inc.,

18     770 Palm Bay Lane, Suite 4-I, Miami, Florida 33138,

19     before Judith M. Caputo, Registered Professional

20     Reporter and Notary Public in and for the State of

21     Florida, when were present on behalf of the

22     respective parties:



**CAROL J. THOMAS STENOTYPE**
**REPORTING SERVICES, INC.**
**3162 MUSKET COURT**
**FAIRFAX, VIRGINIA 22030**
**(703) 273-9221**

2

```
 1   APPEARANCE OF COUNSEL:

 2        For the Plaintiffs:

 3             STEIN, MITCHELL & MEZINES, ESQUIRES

 4             BY:  ARI S. CASPER, ESQUIRE

 5             1100 Connecticut Avenue, N.W., Suite 1100

 6             Washington, D.C.  20036

 7             (202) 737-7777

 8        For the Defendant:

 9             UNITED STATES OF AMERICA

10             BY:  JANE M. LYONS, ESQUIRE

11             Assistant U.S Attorney, Civil Division

12             555 4th Street, N.W., Room E4822

13             Washington, D.C. 20530

14             (202) 514-7161

15                      -  0  -

16

17

18

19

20

21

22
```

1   this chart particular to indoor services as opposed

2   to outdoor services?

3      A.   It applies to either.  In the literature,

4   which is has been voluminous in nature, the standard

5   of care for slip resistance is somewhat universal.

6   Meaning, when you hit that point five mark, and you

7   go below the point five, it's considered slippery.

8   And as an example of that, too, it's even referenced

9   in the American Disabilities Act which is, you need

10   to have a firm and stable surface and some of the

11   notations deep into the ADA talk about the standard

12   of care, that materials below point five are

13   considered slippery.

14      So, whether it be an exterior sidewalk or

15   be an interior lobby for a

16   convenience store, really doesn't matter.  The

17   scale, you know, zero to one applies universally in

18   that realm.

19      Q.   So anything above point five on this

20   chart, is labeled as very safe; do you agree with

21   that?

22      A.   Yes, ma'am.

50

1      Q.    And below that, there are various degrees

2  of safety?

3      A.    Yes, ma'am.

4      Q.    For the dry test that you conducted you

5  found a coefficient of friction of point 57 so that

6  would be safe, correct?

7      A.    Yes, ma'am.

8      Q.    Now, you only gave one wet coefficient of

9  friction and that's for 0.32.  And you have three

10  sets of data, so which points did you use to come up

11  with the point 32?

12      A.    So.  I was having a moment.

13           It was using the ice data not just the

14  water.

15      Q.    So point 32 includes --

16      A.    And, actually, it ranges from point three

17  to point four.  So you would average of the four

18  pulls, it would be between point three and point

19  four.  So it would be about point 35.

20      Q.    What would be about point 35?

21      A.    The coefficient of friction, when I did

22  the test for ice.

1      Q.    Tell me everything that you meant to

2  include by that reference.

3      A.    Part of what I was trying to establish in

4  my own mind's eye and from my experience in coming

5  up to D.C., I've come up to D.C. for many years for

6  different conferences I speak at.  So I'm familiar

7  with New York, D.C. and Baltimore.  I speak

8  regularly at national conferences and conventions

9  around the country.

10          In my site visit in October of 2006, it

11  had been raining that particular afternoon when I

12  had gone to Mr. Casper's office for my pre-site

13  visit preparation.  And as I walked around the

14  different -- I was staying at a hotel not too far

15  from there, and Mr. Casper's office is not too far

16  from the White House.  So we're talking geographic

17  proximity of that area of Washington D.C. that's

18  give or take a quarter half mile radius of the White

19  House and those office buildings.

20          I don't want to say every -- but it would

21  appear that on the route that I went, every single

22  office building that had a lobby foyer, had a mat

1    down and typically had the cones saying, you know,

2    the little yellow cones and picture of someone

3    slipping, you know, and pay attention.

4            And it just reaffirmed the fact that it's

5    standard practice in the northeast that when you

6    have wet conditions because especially in the east,

7    office buildings where there's very nice

8    architectural materials on the floor, sometimes

9    marble granite or things of that nature, that it is

10    standard practice to put down mats and do the cones.

11    And so I just wanted to reaffirm the fact that this

12    wasn't a fluke thing, that in fact -- and this is

13    before I had the government's exhibits of policies

14    and procedures, so I was sort of in the dark of what

15    was your standard of care within government

16    practice, whether it be GSA buildings and/or the

17    White House which is part of the GSA family network.

18        Q.    Yeah, that's a problematic phrase.  What

19    do you base that statement on?

20        A.    GSA is the administrative arm for all the

21    Federal Government buildings, and the White House

22    being one of the Federal Government buildings.  As

1    evidenced by the government's exhibits, they provide

2    the maintenance services and my other arenas, they

3    provide the security services, even though the

4    Secret Service is sort of a separate arm, but you

5    have the GSA is sort of the administrative mechanism

6    for getting things fixed and repaired and having the

7    procedures for mopping up and, you know, dusting and

8    all those kind of protocols are addressed in the

9    policy and procedures manual that was given to me

10   which supports -- and that's produced by GSA.  And

11   that's what the flags in my little things were

12   talking about from the GSA regulations to the actual

13   GSA policies and procedures, and to the actual White

14   House log about how spills, and dusting, and

15   repairing and things of that nature.

16          So, it's a fair expectation that within

17   government building world, we have the White House

18   which is part of that government building world, in

19   which the GSA oversees, unless I can be shown

20   otherwise, their administrator to make sure things

21   get done, fixed and repaired and maintained.  And

22   each building has its own GSA staff.

1          So I'm not saying there's, you know, one

2    person who does it all, but clearly within the White

3    House staff they have their White House prescreened

4    and qualified people to do their cleaning,

5    maintenance and repair and service functions within.

6          Q.    We're getting way off track here, but if

7    you want to keep on going.

8          A.    Within the D.C. area, all these privately

9    owned private sector buildings and also government

10   sector buildings, it's standard practices for having

11   mats and cones, and that really gets back to the

12   focus of the question.

13         Q.    Let's get back to the focus of the

14   question there, you did at the end, I appreciate it.

15         First you told me, I think that the

16   statement in your report is based on the fact that

17   you walked from your hotel to Mr. Casper's office

18   and you walked around D.C. some more in October of

19   2006 and you observed mats and cones in various

20   buildings --

21         A.    Yes, ma'am.

22         Q.    -- in the public entranceways?

78

1    A.   Yes, ma'am.

2    Q.   But you said that some of those floors had

3 different floor coverings than vinyl tiles; is that

4 right?

5    A.   That is right.

6    Q.   You observed as a general practice that

7 mats and cones were used?

8    A.   Yes, ma'am.

9    Q.   Wasn't true in every single building you

10 passed, was it?

11    A.   No.

12    Q.   And then you talked more generally about a

13 standard of care --

14    A.   Yes.

15    Q.   -- in the northeast for the use of mats

16 and cones?

17    A.   Yes, ma'am.

18    Q.   Right.  And then you talked about GSA and

19 so their big responsibility is for cleaning and

20 maintenance and dusting and those kind of things --

21    A.   Yes, ma'am.

22    Q.   -- in the hotel.  And then say the lobby

1    of Mr. Casper's office building, did you look at

2    every entrance to the building to see if there were

3    mats and cones?

4        A.    Of the press area or the White House

5    generically?

6        Q.    No.  I'm asking you about your hotel that

7    you left and Mr. Casper's office building.  Did you

8    look at every entrance and exit?

9        A.    No, ma'am.

10        Q.    Do you have any familiarity with what the

11    practice, or custom, or standard of care is in

12    buildings for employee entrances?

13        A.    In regards to accessibility I do, yes.

14        Q.    What about with regard to the placement of

15    mats and cones?

16        A.    Not necessarily.

17        Q.    Okay.  In your experience, is it common

18    for there to be a difference in areas where the

19    public is expected to traverse as opposed to areas

20    not commonly used by the public?

21        A.    Sometimes.  They're handled differently.

22        Q.    You talked about the materials reviewed

1    from the government which consist of the defendant's

2    response to plaintiff's first request for production

3    of documents.  And defendant's objections and

4    responses to plaintiff's first set of

5    Interrogatories; is that what you were referring to?

6        A.    Yes, ma'am.

7            MR. CASPER:  Before you ask, I would

8        like the record to reflect, because of

9        the press area of the White House was

10       going to be destroyed, Mr. Atlas

11       conducted his inspection without the

12       benefit of all these documents through no

13       fault of anyone.  But at the time he did

14       not have all this and he does now have

15       it.

16           MS. LYONS:  Okay.  That's a very

17       fair point, Mr. Casper.

18   BY MS. LYONS:

19       Q.    There are a couple of green flags on the

20   documents that you've handed me this morning.

21   Mr. Atlas, what is the signature of the green flags?

22       A.    Just in case you were to ask, you know,

1    sort of test my memory on chapter and verse -- well

2    where does it say Ms. Taylor said we commonly put

3    down our mats and I had to scramble around to

4    thinking of what page it was on, I didn't want

5    there to be a challenge saying it wasn't standard by

6    the White House and their own people to put down

7    mats.  So I flagged that in case we had to reference

8    chapter and verse.

9        Q.    So the two places that you've placed green

10   flags, the first is in the GSA Custodial Management

11   Desk Guide --

12       A.    Yes.

13       Q.    -- on page 39, correct?

14       A.    Yes, ma'am.

15       Q.    And then the second one is in Facility

16   Standards for the Public Building Service,

17   March 2005 from GSA?

18       A.    Yes, ma'am.

19       Q.    And there you've got a flag on page 95?

20       A.    Yes, ma'am.  And you can see where I

21   highlighted, it addresses how when you have wet and

22   ice conditions that they should be putting mats

1    down?

2         Q.    Right.   The exact language, "It is

3    desirable to have" -- oh, no, that's different?

4         A.    If you look at the top there --

5         Q.    That talks about high volume entry ways,

6    right?

7         A.    Yes, ma'am.

8         Q.    What is your understanding of the

9    volume -- what is a high volume entry way?

10        A.    Well, it's relevant to the -- it's

11   relative to the square footage and the number of

12   people.

13             However, from my understanding from

14   Mr. Frazza discussion, this was a very busy

15   well-traveled area because of all the press

16   reporters.  This was their hangout area where they

17   had coffee, bathrooms and tables to sort of get

18   their things in order.  So it was a very heavily

19   used area as per -- it was a relatively small space.

20   And even maybe only have been mine -- I'm guessing

21   now, you know, 30 to 40 people, but it was

22   constantly used during the different times of the

83

1    day, very intensely when the President was there,

2    and they were having to prepare or wait, you know,

3    once the President came out.  So I think this was a

4    fairly heavily trafficked area for the press and

5    their support staff.

6        Q.    Would the fact that January 23rd, 2005 was

7    a Sunday be at all relevant to your assessment of

8    the high volume on that particular day?

9        A.    Under normal circumstances you would

10   think, no.  But when the President shows up

11   somewhere, all bets are off.  So it doesn't matter

12   whether it's 4 o'clock in the morning, or a Sunday

13   afternoon, when the boss man shows up, people have

14   got to go and look like they pay attention.

15       Q.    That's based on what Mr. Frazza told you,

16   correct, you don't have any personal knowledge of

17   those --

18       A.    That's correct.

19       Q.    Is there anything in the

20   government's discovery responses that we were just

21   talking about that you would add or change about

22   your report?

84

1      A.    No.   In fact, I think the report,

2    especially since it was prior to me getting the

3    government materials, the only thing I would have

4    added to my report, would be, you know, citing

5    chapter and verse documenting the fact that it was

6    standard practice from GSA to maintain a clean and

7    well-maintained building.   That it was recommended

8    by their own standards, that they have mats in well

9    traveled areas.   And that I would have stated pretty

10   much sort of the line and chapter of the two

11   depositions that state, yes, it's our standard

12   practice to have the mats down and, you know, keep

13   them maintained, and I think the only issue there

14   was sometimes reporters might roll them up, or place

15   them to the side.   Their job was when they came out

16   to work to make sure everything was clean and laid

17   out.

18      Q.    You made reference a minute ago to the

19   depositions.   Were you referring to the deposition

20   of Dorothy Taylor and Dorothy Rose?

21      A.    Yes, ma'am.

22      Q.    Have you reviewed them personally?

1       A.    Yes, ma'am.

2       Q.    You have a bunch of green flags on Ms.

3    Taylor's deposition.

4       A.    Yes, ma'am.

5       Q.    You placed them there?

6       A.    Yes.

7       Q.    And the highlighting I'm looking at is

8    yours?

9       A.    Yes, ma'am.

10       Q.    And how about the red circle?

11       A.    Yes.  But just to sort of finish answering

12    the question.

13            There's nothing at this point that would

14    cause me to change my opinion on the focus, and

15    tone, and direction of my report.

16       Q.    Does that include -- with respect to any

17    changes that might have been as a result of the

18    depositions you reviewed?

19       A.    No.  The deposition strictly reinforced

20    what your GSA practice, and policies, and procedures

21    are.

22       Q.    Okay.  Somewhere in this pile, there's a

1          Q.    -- September 2005; do you recall that?

2          A.    Yes.

3          Q.    The title of your presentation was, "Good

4    Designs Gone Bad, What Were You Thinking"?

5          A.    Yes.

6          Q.    Did that have anything to do with floor?

7          A.    No.   It was more about security-related

8    issues where buildings were just designed badly that

9    were increasing the possibilities and probabilities

10   of people being attacked or cars being stolen, or

11   being mugged and assaulted.   Bad lighting, nuks and

12   crannies, blind spots, those kinds of things.

13         Q.    So having testified here today that the

14   coefficient of friction on the wet floor that you

15   tested where Mr. Frazza fell was point 85, is it

16   still your opinion to a reasonable architectural

17   probability that this accident was the fault of the

18   United States?

19         A.    Yes.   For the reasons being, that while

20   the floor itself wasn't slippery, dry, or

21   essentially wet with water.   That with the snow and

22   ice conditions, the vinyl tile is a very slippery

1    surface, as my test did prove to myself, and the

2    fact that there was an expectation for that -- for

3    the floor to be slip resistant, as you came in from

4    the outside to the inside, and had the standard

5    practices of the White House been followed, which is

6    to have mats there, and have them down in place,

7    that it's my opinion, within a reasonable level of

8    architectural certainty, that that slip and fall

9    would not have occurred had that mat been there.

10       Q.   And what role do you consider Mr. Frazza

11   to have played in his accident?

12            MR. CASPER:  Object to the vagueness

13       of the question.

14            If you understand it, you can answer it.

15            THE WITNESS:  I think that the

16       person walking plays a role in as far as

17       how they walk and, you know, paying attention.

18       Being present, as far as what the

19       conditions are.  But you can't really

20       tell, especially, in an environment where

21       the weather is being hostile, coming in

22       from a dark asphalt into the white concrete and

1    A.    Given the hypothetical that the mat was
2   not there, his choices would have been not to walk
3   into the room.   That would have been, as soon as --
4   if -- I'm choosing to make the assumption that if in
5   fact he chose to go into the staff area, with the
6   shoes that he was wearing, then this accident would
7   have been unavoidable, it would have been a high
8   degree of probability of certainty based on the
9   nature of the ice and the snow and the rubber sort
10   of gripping action and the smoothness of the vinyl
11   tile.
12    Q.    You say on page 2 of your opinion,
13   Mr. Atlas, that you're an expert in slips, trips and
14   fall accidents?
15    A.    Yes, ma'am.
16    Q.    What experience, background and training
17   certification do you have that qualifies you as an
18   expert in slips, trips and falls?
19    A.    Several different things.   First I
20   attended several workshops in slip an fall
21   accidents, and that's documented in my resumθ there.
22    I have written several articles about

1    slips, trips and falls, and also what the codes

2    require for architects.  I have performed, on an

3    experiential level, numerous site inspections and

4    evaluations of architectural factors and/or defects

5    that have resulted in people being hurt regarding

6    slip, trips and falls.  And, my educational

7    experience as a registered architect of six years of

8    college in architectural school, and the years of

9    practice and also becoming registered both in the

10   State of Florida and on a national level through our

11   incarceration, that in architecture school, we are

12   trained in human factors and ergonomics.  And,

13   finally, on the human factors and ergonomics aspects

14   of slip, trips and falls.  I have done considerable

15   reading -- I have done presentations in talking and

16   writing, as well as I am a member of the

17   professional organization known as the Human Factors

18   and Ergonomical Society.

19          So I have academic experience, I have

20   experiential experience, and I have practical or

21   more real world experience.

22          Q.    I'm trying not to ask you ten questions

1    about ergonomics, so bear with me.

2           What role does ergonomics play in the

3    analysis of a slip and fall?

4       A.    A lot in that the human factors and/or

5    ergonomics which are relatively synonymous involve

6    the human dimension.  In slips, it involves the

7    issues of force and size and what kind of materials.

8    Was the person running, were they running around the

9    pool deck, you know, when your parents say, don't

10   run around the pool, you know, those kinds of

11   things.  Because you're barefoot and the human skin

12   is slippery when it's wet you hydroplane, even if

13   it's on rough concrete, or the smoothness of the

14   pool deck.  So, the human factors of what was the

15   causation elements leading up to the mechanics of

16   the fall.

17          In trips, it would be the human factors

18   especially important about how you catch an edge, or

19   how you misstep.  In falls, it's about whether it be

20   the human factors of how you misstep down a set of

21   stairs or you, you know, you can't grip a railing

22   because it was, you know, a two-by-four that they

1    have given as a railing, and you're getting

2    splinters going all the way down a railing that

3    wasn't designed as a railing.

4         So that's issues about what the normal

5    human gait is, what the grips are.  What is, you

6    know, postures, for example, the elderly who have a

7    different center of gravity balance because they're,

8    you know, they're humped, you know, they're bent

9    over, or they're not paying attention, their eyes

10   can't see as well, that's different than someone,

11   you know, early or middle-aged where they're

12   standing upright or have a good center of gravity.

13   And that's different than a small child who might be

14   very light and running or, you know, very different.

15        So the human factors in ergonomics does

16   play a role, as far the dynamics of how people get

17   hurt.

18        Q.    How did it play a role specifically in

19   Mr. Frazza's case?

20        A.    I think the human factors ergonomics

21   played a role in Mr. Frazza's accident by the

22   ability of what his gait was, meaning, his width of