UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| LUKE FRAZZA and MARY FRAZZA,<br><br>    Plaintiffs,<br><br>    v.<br><br>UNITED STATES OF AMERICA,<br><br>    Defendant. | Civil Action No. 06–1410 (CKK) |

**MEMORANDUM OPINION**
(January 7, 2008)

Plaintiffs, Luke and Mary Frazza, bring this action against Defendant, the United States of America, pursuant to the Federal Tort Claims Act, 28 U.S.C. § 2671, *et seq.*  Luke Frazza ("Mr. Frazza") is a photographer for a news media organization, who was assigned to photograph the President of the United States at the White House.  During the course of that assignment, Mr. Frazza slipped and fell, sustaining injuries to his back and spinal cord.  Mr. Frazza alleges that his fall and resulting injuries were caused by Defendant's negligence; his wife, Mary Frazza ("Mrs. Frazza"), claims loss of consortium and services.  Defendant has moved for summary judgment on the issue of liability, asserting that Plaintiffs' negligence-based claims fail because Plaintiffs cannot prove a breach of an applicable and defined standard of care.  Upon a searching review of Defendant's Motion for Summary Judgment, Plaintiffs' Opposition, Defendant's Reply, the exhibits attached to those filings, the relevant statutes and case law, and the entire record herein, the Court shall grant Defendant's Motion for Summary Judgment and shall dismiss this case in its entirety.

# I. BACKGROUND

The Court begins its discussion of the facts by noting that this Court strictly adheres to the text of Local Civil Rule 56.1 (identical to Local Civil Rule 7(h) (formerly Rule 7.1(h)), and that Plaintiffs were advised of the Court's strict compliance with the local rules in the Scheduling and Procedures Order entered on October 31, 2006 and at the Status Conference held in this matter on May 4, 2007. The local rules for summary judgment "assist[] the district court to maintain docket control and to decide motions for summary judgment efficiently and effectively." *Jackson v. Finnegan, Henderson, Farabow, Garret & Dunner*, 101 F.3d 145, 150 (D.C. Cir. 1996). "Requiring strict compliance with the local rule is justified both by the nature of summary judgment and by the rule's purposes. . . . The procedure contemplated by the rule thus isolates the facts that the parties assert are material, distinguishes disputed from undisputed facts, and identifies the pertinent parts of the record." *Id.* (quoting *Gardels v. CIA*, 637 F.2d 770, 773 (D.C. Cir. 1980)).

In particular, Local Civil Rule 56.1 requires that each party submitting a motion for summary judgment attach a statement of material facts as to which that party contends there is no genuine issue, with specific citations to those portions of the record upon which the party relies in fashioning the statement.[1] The party opposing such a motion must, in turn, submit a statement

---

[1] The Rule provides, in relevant part:

Each motion for summary judgment shall be accompanied by a statement of material facts as to which the moving party contends there is no genuine issue, which shall include references to the parts of the record relied on to support the statement. An opposition to such a motion shall be accompanied by a separate concise statement of genuine issues setting forth all material facts as to which it is contended there exists a genuine issue necessary to be litigated, which shall include references to the parts of the record relied on to support the statement. . . . In determining a motion for

of genuine issues enumerating all material facts that the party contends are at issue and thus

require litigation.  *See* LCvR 56.1.  Where the opposing party fails to discharge this obligation, a

court may take all facts alleged by the movant as admitted.  LCvR 56.1.  As the D.C. Circuit has

emphasized, "[LCvR 56.1] places the burden on the parties and their counsel, who are most

familiar with the litigation and the record, to crystallize for the district court the material facts

and relevant portions of the record."  *Jackson*, 101 F.3d at 151.

Defendant complied with its obligation pursuant to Local Civil Rule 56.1 by submitting,

along with its Motion for Summary Judgment, a Statement of Material Facts Not in Genuine

Dispute (hereinafter "Def.'s Stmt.") that sets forth in numbered paragraphs Defendant's factual

assertions, supported by precise citations to the record.  Plaintiffs, however, failed to carry their

burden under Local Civil Rule 56.1, because they did not submit a "separate concise statement of

genuine issues," along with their Opposition.  *See* LCvR 56.1.  Indeed, Plaintiffs' Opposition

does not even attempt to controvert Defendant's specific factual assertions.  *See generally* Pls'

Opp'n.[2]  In light of this failure, pursuant to Local Civil Rule 56.1, in resolving the instant motion,

the Court assumes that the facts identified by Defendant in its Statement are admitted.  *See* LCvR

---

summary judgment, *the Court may assume that facts identified by the moving party
in its statement of material facts are admitted, unless such a fact is controverted in
the statement of genuine issues filed in opposition to the motion*.

LCvR 56.1 (emphasis added).

[2] Plaintiffs' Opposition contains a section entitled "Relevant Facts," which does not
address Defendant's factual assertions either specifically or generally.  Pls' Opp'n at 3-4.
Plaintiffs also include a section entitled "Summary Statement of Disputed Facts," in which they
purport to identify "several genuine disputes of material fact rendering summary disposition
inappropriate."  *Id.* at 5-6.  However, as discussed below, none of the four "disputes" identified
by Plaintiffs actually constitutes a genuine issue of material fact that precludes summary
judgment in favor of Defendant.

56.1. In addition, to the extent that Plaintiffs' "Relevant Facts" section adds details not included in Defendant's Statement but supported by citations to record evidence, the Court credits those assertions below.

    A.    *The Circumstances of Mr. Frazza's Injury*

    The facts of this case present a rather straightforward negligence claim. Plaintiff Luke Frazza is a photographer with Agence France-Presse ("AFP"). Def.'s Stmt. ¶ 1; Compl. ¶ 3. In January 2005, Mr. Frazza was assigned to cover the White House and take pictures of the President of the United States. Def.'s Stmt. ¶ 1; Compl. ¶ 3. As a result, Mr. Frazza had access to portions of the White House complex. Def.'s Stmt. ¶ 1. On January 23, 2005, there was a heavy snow storm in the Washington, D.C. area. Compl. ¶ 5; Pls' Opp'n at 3 (citing Pls' Opp'n, Ex. 3 (3/14/07 Tr. of Dep. of L. Frazza) at 15:21-16:8 (hereinafter "Frazza Dep.")). On that day, Mr. Frazza was carrying out his duties at the White House, and was moving from the North Portico driveway to the south lawn to photograph the President departing by helicopter. Pls' Opp'n at 3 (citing Pls' Opp'n, Ex. 3 (Frazza Dep.) at 45:18-46:19. On the way, Mr. Frazza decided to drop off some of his equipment at his desk within the White House press area. *Id.*; Pls' Opp'n, Ex. 3 (Frazza Dep.) at 45:18-47:5. While carrying his usual complement of equipment, Mr. Frazza slipped and fell as he entered a doorway leading from the outside into the press lunch area of the White House. Def.'s Stmt. ¶ 2; Def.'s MSJ, Ex. 3 (Frazza Dep.) at 32:17-24, 49:16-25.[3] Mr. Frazza believes that the vinyl tile surface of the floor where he slipped

---

    [3] Both Plaintiffs and Defendant proffer portions of the transcript of Mr. Frazza's March 14, 2007 deposition in support of their their summary judgment filings. *See* Pls' Opp'n, Ex. 3; Def.'s MSJ, Ex. 3. Because the parties proffer slightly different excerpts of the deposition transcript, the Court refers to each party's exhibit as appropriate.

was wet at the time. Def.'s Stmt. ¶ 3; Def.'s MSJ, Ex. 3 (Frazza Dep.) at 49:19-25; 52:20-53:9.

Mr. Frazza does not, however, recall whether his pants were wet after he fell, or whether he felt

cold after falling. *Id.* at 53:4-9. In the "Relevant Facts" section of their Opposition, Plaintiffs

describe the floor where Mr. Frazza fell as wet, but not as icy. Pl's Opp'n at 3.

Plaintiffs' Complaint alleges that Mr. Frazza sustained serious and permanent injuries to

his back and spinal cord as a result of his fall at the White House on January 23, 2005, and that

his injuries "caus[e] constant pain and inhibit[] him in every aspect of his life." Compl. ¶ 5.[4]

Plaintiffs further allege that "[a]s a direct and proximate result of Mr. Frazza's injuries, he has

incurred and will incur medical and related expenses," as well as a loss of earnings, impairment

of earning capacity, and significant physical and emotional pain and suffering. *Id.* ¶ 6. Mrs.

Frazza "makes a claim for the loss of consortium and services caused by" Mr. Frazza's injuries.

*Id.* ¶ 9.

B.    *Plaintiffs' Proposed Expert's Findings*

Pursuant to the Court's Scheduling and Procedures Order and Federal Rule of Civil

Procedure 26(a)(2), Plaintiffs identified Dr. Randall Atlas, "a safety and security consultant who

is a certified professional with the American Society of Industrial Security (ASIS) and is

affiliated with the American Society of Safety Engineers," as an expert to "testify as to the

standard of care in building maintenance during inclement weather." Def.'s Stmt. ¶ 4; Def.'s

---

[4] As noted below, discovery in this action is proceeding in two phases–liability and damages–and damages discovery is not yet complete. *See* Minute Orders, *Frazza v. United States*, Civil Action No. 06-1410 (D.D.C. May 7, 2007 and Oct. 17, 2007). As a result, and because Defendant's Motion for Summary Judgment is limited to an issue regarding liability, Plaintiffs do not proffer evidence of Mr. Frazza's injuries and alleged damages in opposition to Defendant's Motion.

MSJ, Ex. 4 (Pls' Expert Witness Stmt) ¶ 5.  In his January 26, 2007 Report, Dr. Atlas describes

himself as an "expert on human factors, ergonomics, and architectural safety issues."  Def.'s

MSJ, Ex. 1 (1/26/07 Atlas Rep.) at 1; *see also* Pls' Opp'n, Ex. 9 (Atlas Curriculum Vitae and

Testifying Experience).[5]  Dr. Atlas' Report describes an inspection he conducted of the site of

Mr. Frazza's fall on October 20, 2006, and asserts that "Mr. Frazza stated that on the day of the

accident, there were no protective mats, nor any cones warning of the wet surfaces."  Def.'s MSJ,

Ex. 1 (Atlas Rep.) at 1.

      Dr. Atlas' Report identifies the applicable standard for evaluating a surface made up of

the type of vinyl tile on which Mr. Frazza allegedly fell as American Society of Testing Materials

Technical Publication No. 649 ("ASTM 649").  *Id.* at 1-2.  ASTM 649 sets forth a benchmark

coefficient of friction of 0.5: a coefficient of friction above 0.5 is considered acceptably safe,

while a coefficient of friction below 0.5 is considered slippery.  *Id.*; *see also* Def.'s Stmt. ¶ 5.

During his October 20, 2006 site inspection, Dr. Atlas personally conducted tests of the tile

where Mr. Frazza fell, under wet, dry, and icy conditions.  *Id.* ¶ 6; Def.'s MSJ, Ex. 2 (3/22/07

Atlas Dep. Tr.) at 24:20-27:8.  Dr. Atlas determined that the floor where Mr. Frazza fell had a

coefficient of friction of 0.57 when dry, and accordingly testified during his deposition that, when

dry, the tile floor was safe and within the standard of care defined by ASTM 649.  Def.'s Stmt. ¶

7; Def.'s MSJ, Ex. 1 (Atlas Rep.) at 1-2; Def.'s MSJ, Ex. 2 (Atlas Dep.) at 39:4-6, 50:4-7.

      During his deposition, Dr. Atlas testified that his testing revealed that when wet, the

particular floor where Mr. Frazza fell had a coefficient of friction of 0.85, and was therefore

_____

[5] Plaintiffs similarly proffer Dr. Atlas' January 26, 2007 Report as Exhibit 1 to their
Opposition.  The Court refers to each party's exhibit where cited by that party.

"actually more slip resistant" than when dry. Def.'s Stmt. ¶ 8; Def.'s MSJ, Ex. 2 (Atlas Dep.) at

51:1-52:19.[6] Dr. Atlas explained that he did not include the results of his wet floor test in his

Report because "it was unusual to find where the coefficient of friction when it was wet was

actually greater than when it was dry," but also testified that such results were possible and that

he did not think his data was flawed because he rechecked his results. *Id.* at 51:15-52:6. The

parties do not dispute–and Dr. Atlas testified–that a coefficient of friction of 0.85 is well above

the standard of care set by ASTM 649. Def.'s Stmt. ¶ 8; Def.'s MSJ, Ex. 2 (Atlas Dep.) at 51:16-

19.[7]

In his Report, Dr. Atlas stated that his "testing confirmed that the floor, in icy conditions,

had a coefficient of friction of 0.34," which "falls below the [coefficient of friction] required by

---

[6] Although Defendant's Statement of Material Facts asserts that "Dr. Atlas determined that the coefficient of the floor while wet was 0.87," that assertion is supported by a citation to Dr. Atlas' deposition in which he testifies that he determined that the wet coefficient of friction was 0.85. *See* Def.'s Stmt. ¶ 8 (citing Def.'s MSJ, Ex. 2 (Atlas Dep.) at 50-52). Plaintiff does not address Defendant's assertion. The Court therefore assumes that Defendant is incorrect, and that Dr. Atlas actually determined the coefficient of friction for the wet floor to be 0.85.

[7] In his Report, Dr. Atlas asserts that the subcommittee that authored ASTM 649 "found that dry vinyl surfacing had a . . . wet [coefficient of friction] of 0.32." Def.'s MSJ, Ex. 1 (Atlas Rep.) at 1-2. Defendant's Statement suggests, based on Dr. Atlas' deposition testimony, that "Dr. Atlas arrived at that result by taking an average of the data he obtained for wet and icy conditions." Def.'s Stmt. ¶ 8 (citing Def.'s MSJ, Ex. 2 (Atlas Dep.) at 50-52). Defendant is correct that during his deposition, when asked why his report referred to a wet coefficient of friction of 0.32, Dr. Atlas confirmed that he combined the coefficients of friction for "wet with the ice." Def.'s MSJ, Ex. 2 (Atlas Dep.) at 52:7-15. However, that average is unlikely in light of Dr. Atlas' assertion in his Report that his "testing confirmed that the floor, in icy conditions, had a coefficient of friction of 0.34." Def.'s MSJ, Ex. 1 (Atlas Rep.) at 2. It therefore appears that the reference to a wet coefficient of friction of 0.32 in Dr. Atlas' Report may refer to a finding made in ASTM 649, rather than the actual results of Dr. Atlas' personal testing. In all events, the record is clear that Dr. Atlas' personal testing of the floor where Mr. Frazza allegedly fell revealed a wet coefficient of friction of 0.85, which far surpasses the ASTM benchmark standard of care of 0.5 and is therefore considered acceptably safe. Def.'s MSJ, Ex. 2 (Atlas Dep.) at 51:1-52:19.

ASTM to maintain a non-slippery environment." Def.'s MSJ, Ex. 1 (Atlas Rep.) at 2. During

his deposition, Mr. Frazza testified that there was a heavy snowfall on the morning on which he

fell and that a snow emergency was in effect in Washington, D.C. Pls' Opp'n, Ex. 3 (Frazza

Dep.) at 16:15-10; 19:6-24. Nevertheless, in both his deposition testimony and his Opposition,

Mr. Frazza did not describe the floor where he fell as icy, but rather described it as wet. *Id.* at

49:19-25; Def.'s MSJ, Ex. 3 (Frazza Dep.) at 53:2-9; Pls' Opp'n at 3. Furthermore, Dr. Atlas

testified during his deposition that Mr. Frazza never indicated to him that there was ice on the

floor on which he fell. Def.'s Stmt. ¶ 9; Def.'s MSJ, Ex. 2 (Atlas Dep.) at 55:6-12. The record is

therefore devoid of evidence that the floor on which Mr. Frazza slipped was icy when he stepped

on it.[8] In addition, as Defendant notes, during his deposition, Dr. Atlas acknowledged that he did

not consider the type of vinyl flooring in place where Mr. Frazza allegedly slipped to be an

unsafe choice, that it is a "commonly used architectural material," and that he was "comfortable

in stating that it did not violate any building codes." *Id.* at 36:14-37:2, 54:17-55:5.

In addition to discussing ASTM 649, Dr. Atlas' Report and his deposition testimony

contain his opinion that "it is customary and standard practice to have mats and warning cones at

entrances to buildings that experience winter conditions, especially in the Northeast United States

and Washington, DC." Def.'s MSJ, Ex. 1 (Atlas Rep.) at 2; Pls' Opp'n Ex. 7 (Atlas Dep.) at

---

[8] Dr. Atlas speculated that Mr. Frazza could have tracked in material that caused him to
slip as he entered the press room from outdoors, that others who had come in before Mr. Frazza
could have tracked in material, or that "with the door being open, that snow or ice could have
been blown in." Def.'s MSJ, Ex. 2 (Atlas Dep.) at 68:6-18. However, Dr. Atlas admitted that he
did not "have any particular knowledge of it, so [he couldn't] attest to that with certainty." *Id.* at
68:19-69:1. Moreover, although Dr. Atlas stated that he was "very comfortable attesting with a
very high level of probability, that within Mr. Frazza's own shoes, he was carrying stuff with
him," *id.* at 69:1-4, Dr. Atlas' speculation does not establish that the floor on which Mr. Frazza
slipped was actually icy at the time.

75:4-10.  Dr. Atlas' Report and deposition testimony also discuss his observation of warning

cones and floor mats in building entrances in Washington, D.C. during his visit to the city on a

rainy day for his October 20, 2006 site inspection.  Def.'s MSJ, Ex. 1 (Atlas Rep.) at 2; Pls'

Opp'n Ex. 7 (Atlas Dep.) at 74:1-75:3.  During his deposition, Dr. Atlas acknowledged that many

of the buildings he observed on October 20, 2006 had floor coverings other than vinyl tiles, that

mats and cones were not used in all buildings he passed, and that areas where the public is

expected to travel might be "handled differently" than areas not commonly used by the public.

Pls' Opp'n, Ex. 7 (Atlas Dep.) at 77:15-79:21.  Nevertheless, in his Report Dr. Atlas concludes:

> It is my opinion, as an expert in slips, trips and fall accidents, that this accident
> was foreseeable and preventable.  Had the White House maintenance staff placed
> mats at the foyer entrance, Mr. Frazza would not have slipped on the vinyl
> flooring.  In addition, there should have been the typical cones warning
> individuals to watch where they are walking. . . . Had these measures been used, it
> is my opinion within a reasonable architectural probability that the accident would
> not have occurred.

Def.'s MSJ, Ex. 1 (Atlas Rep.) at 2.

During his deposition, Dr. Atlas also referred to two General Services Administration

("GSA") internal publications–entitled "Custodial Management Desk Guide" and "Facility

Standards for the Public Building Service"–which Dr. Atlas asserted "address[] how when you

have wet and ice conditions that they should be putting mats down."  Pls' Opp'n, Ex. 7 (Atlas

Dep.) at 81:9-82:1.  Plaintiffs only include a portion of the latter publication as an Exhibit to their

Opposition, which states that "[b]uildings located in areas with severe weather conditions will

require more elaborate entry mat and drainage systems to prevent the tracking of melting snow

and rain."  Pls' Opp'n, Ex. 10 (GSA "Facility Standards for the Public Building Service") at 95.

It appears from Dr. Atlas' deposition testimony that the other document, "Custodial Management

Desk Guide," addresses the use of mats in "high volume entry ways." Pls' Opp'n, Ex. 7 (Atlas

Dep.) at 81:9-83:5.

Finally, Plaintiffs proffer portions of the deposition testimony of the two White House

maintenance employees working on the day that Mr. Frazza fell, who testified that mats and

warning signs were often used in the White House in wet or icy conditions. *See* Pls' Opp'n at 9-

10; Pls' Opp'n, Ex. 5 (1/30/07 Tr. of Dep. of Dorothy M. Rose) at 20:6-21:5 ("I'm not saying a

policy . . . I want to say that we know what to do . . . if it's raining or snowing. . . . We put wet

floor signs up, put the mats down, and make sure the area is safe, you know, for people to walk

by -- walk through."); Pls' Opp'n, Ex. 6 (1/30/07 Tr. of Dep. of Dorie Taylor) at 54:17-55:21 (If

the weather's bad -- or even if it's good. . . that carpet is supposed to be sitting right there on that

floor."). However, during his deposition, Mr. Frazza confirmed that he had "probably" been in

the White House press lunchroom area "at least a thousand times," and that he could not

remember whether he had ever seen a mat or carpet at the entrance to the foyer. Def.'s Reply,

Ex. 1 (Frazza Dep.) at 27:13-21. In particular, he testified that there was no mat in place when he

slipped on the tile floor. Pls' Opp'n, Ex. 3 (Frazza Dep.) at 49:19-25. As Defendant

acknowledges, there is thus a factual question as to whether the White House had a practice of

putting down mats during inclement weather, and whether a mat was actually in place when Mr.

Frazza fell. *See* Def.'s Reply at 4-5.

Regardless of the factual question as to whether a mat was in place when Mr. Frazza fell,

Plaintiffs do not proffer expert testimony regarding the relative slipperiness, when wet, of the

mats ordinarily used in the White House and the actual vinyl tile floor where Mr. Frazza fell. In

particular, Dr. Atlas offers no evidence that–in light of the fact that the actual vinyl tile floor had

10

a coefficient of friction of 0.85 when wet–a mat would have been any safer than (or even as safe

as) the vinyl tile floor.

C.    *Procedural History*

Plaintiffs filed their Complaint in this action on August 8, 2006.  The parties thereafter

agreed to complete discovery regarding liability prior to discovery regarding damages, and the

Court approved a staggered discovery schedule at the May 4, 2007 Status Conference in this

matter.  Following the completion of liability discovery, and in accordance with the schedule set

forth by the Court at that Status Conference, Defendant filed its Motion for Summary Judgment

on May 18, 2007; Plaintiffs filed their Opposition to Defendant's Motion on June 1, 2007; and

Defendant filed its Reply on June 15, 2007.  Defendant's Motion relates solely to liability, as

damages discovery is still ongoing, but is nevertheless ripe for resolution.

## II.  LEGAL STANDARD

A party is entitled to summary judgment if the pleadings, depositions, and affidavits

demonstrate that there is no genuine issue of material fact in dispute and that the moving party is

entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(c); *Tao v. Freeh*, 27 F.3d 635, 638

(D.C. Cir. 1994).  Under the summary judgment standard, Defendant, as the moving party, "bears

the initial responsibility of informing the district court of the basis for its motion, and identifying

those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file,

together with the affidavits, if any' which it believes demonstrate the absence of a genuine issue

of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Plaintiff, in response to

Defendants' motion, must "go beyond the pleadings and by [its] own affidavits, or by the

'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts

showing that there is a genuine issue for trial.'" *Id.* at 324.

Although a court should draw all inferences from the supporting records submitted by the nonmoving party, the mere existence of a factual dispute, by itself, is not sufficient to bar summary judgment. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). To be material, the factual assertion must be capable of affecting the substantive outcome of the litigation; to be genuine, the issue must be supported by sufficient admissible evidence that a reasonable trier-of-fact could find for the nonmoving party. *Laningham v. U.S. Navy*, 813 F.2d 1236, 1242-43 (D.C. Cir. 1987); *Liberty Lobby*, 477 U.S. at 251-52, (the court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law"). "If the evidence is merely colorable, or is not sufficiently probative, summary judgment may be granted." *Liberty Lobby*, 477 U.S. at 249-50 (internal citations omitted). "Mere allegations or denials of the adverse party's pleading are not enough to prevent the issuance of summary judgment." *Williams v. Callaghan*, 938 F. Supp. 46, 49 (D.D.C. 1996). The adverse party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Instead, while the movant bears the initial responsibility of identifying those portions of the record that demonstrate the absence of a genuine issue of material fact, the burden shifts to the non-movant to "come forward with 'specific facts showing that there is a *genuine issue for trial*.'" *Id.* at 587 (citing Fed. R. Civ. P. 56(e)) (emphasis in original).

### III.  DISCUSSION

Plaintiffs Luke and Mary Frazza each assert claims, grounded in an allegation of

negligence, against the United States of America pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2671, *et seq.* "It is elementary that the United States, as sovereign, is immune from suit save as it consents to be sued, and the terms of its consent to be sued in any court define that court's jurisdiction to entertain that suit." *United States v. Mitchell*, 445 U.S. 535, 538 (1980) (citation omitted). Moreover, "a waiver of sovereign immunity 'cannot be implied but must be unequivocally expressed.'" *Id.* (citing *United States v. King*, 395 U.S. 1, 4 (1969)). "The FTCA represents a limited waiver of the government's sovereign immunity," which grants this Court jurisdiction over a certain category of claims for which the United States has rendered itself liable," and provides the exclusive remedy for common law tort claims against the United States. *Tri-State Hosp. Supply Corp. v. United States*, 341 F.3d 571, 575 (D.C. Cir. 2003) (citing *United States v. Orleans*, 425 U.S. 807, 813 (1976)); *see also FDIC v. Meyer*, 510 U.S. 473, 476-77 (1994)). In particular, section 1346(b) of the FTCA provides that the federal district courts

> shall have exclusive jurisdiction of civil actions on claims against the United States, for money damages . . . for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

28 U.S.C. § 1346(b)(1); *see also Tri-State Hosp. Supply Corp.*, 341 F.3d at 575.

    *A.    The Necessity of Expert Testimony*

In considering Plaintiffs' negligence-based claims, then, the Court applies the law of the District of Columbia. *See* 28 U.S.C. § 1346(b)(1). As such, "[i]n an action for negligence, the plaintiff has the burden of proving by a preponderance of the evidence the applicable standard of

care, a deviation from that standard by the defendant, and a causal relationship between the deviation and the plaintiff's injury." *Varner v. District of Columbia*, 891 A.2d 260, 265 (D.C. 2006). The parties do not dispute that Mr. Frazza was lawfully on the White House grounds at the time of his injury, or that under District of Columbia law, "there is only one standard of care for persons lawfully upon [a] landowner's or land occupier's property, and that is reasonable care under the circumstances." *Sandoe v. Lefta Assocs.*, 559 A.2d 732, 742 (D.C. 1989); *see also id.* at 738 ("this jurisdiction does not recognize varying standards of care depending upon the relationship of the parties but always requires reasonable care to be exercised under all the circumstances") (quoting *Blumenthal v. Cairo Hotel Corp.*, 256 A.2d 400, 402 (D.C. 1969)).

Thus, in proving their negligence claim, Plaintiffs are required to establish what constitutes "reasonable care" under the circumstances of this case. *Haney v. Marriott Int'l, Inc.*, Civil Action No. 05-2501 (JDB), 2007 WL 2936087, at *4 (D.D.C. Oct. 9, 2000). Pursuant to the District of Columbia's "expert testimony requirement," "a plaintiff must put on expert testimony to establish what the standard of care is if the subject in question is so distinctly related to some science, profession or occupation as to be beyond the ken of the average layperson." *Briggs v. Washington Metro. Area Transit Auth.*, 481 F.3d 839, 845 (D.C. Cir. 2007) (quoting *District of Columbia v. Hampton*, 666 A.2d 30, 35-36 (D.C. 1995) and *District of Columbia v. Arnold & Porter*, 756 A.2d 427, 433 (D.C. 2000)). There is a partial exception to this rule where "the subject matter is within the realm of common knowledge and everyday experience." *Id.* (quoting *Hill v. Metro. African Methodist Episcopal Church*, 779 A.2d 906, 908 (D.C. 2001)). However, "[t]he D.C. Court of Appeals has required expert testimony in a number of cases that, on first blush, appear to be within the realm of common knowledge." *Id.* (citing cases requiring

14

Case 1:06-cv-01410-CKK    Document 20    Filed 01/07/2008    Page 15 of 26

expert guidance as to subject matters that "might be familiar to jurors"); *see also Haney*, 2007 WL 2936087, at *4 ("The District of Columbia Court of Appeals has recognized a trend in District of Columbia law to require expert testimony to establish the applicable standard of care in an increasing variety of circumstances.") (citing cases).

Plaintiffs do not argue that they can establish the appropriate standard of care without the aid of expert testimony, nor does the Court find that Plaintiffs could do so. Instead, Plaintiffs contend that Dr. Atlas' Report and deposition testimony are sufficient to satisfy the expert testimony requirement and establish the relevant standard of care. Pls' Opp'n at 2-3 (citing Pls' Opp'n, Ex. 1 (1/26/07 Atlas Rep.) at 2). As discussed above, Dr. Atlas' Report and deposition testimony focus in part on his testing of the coefficient of friction of the floor where Mr. Frazza fell pursuant to ASTM 649. The technical nature of this testing demonstrates clearly that the relevant standard of care in this action is "beyond the ken of the average layperson." *Briggs*, 481 F.3d at 845. While an average person may be familiar with the experience of slipping on a wet surface, determining the coefficient of friction of that surface is certainly outside "the realm of common knowledge and everyday experience." *Id.*; *see also Haney*, 2007 WL 2936087, at *5-6 (concluding that expert testimony was necessary where a plaintiff slipped and fell in a bathtub because establishing the relevant standard of care involved "[p]roof of compliance with suitable ASTM standards and the appropriate coefficients of friction for bathtub surfaces."). Having thus concluded that Plaintiffs are required to establish the relevant standard of care and a breach thereof through expert testimony, the Court turns to considering whether Dr. Atlas' Report and deposition testimony are sufficient to do so.

15

B.    *The Sufficiency of Dr. Atlas' Report and Testimony*

Plaintiffs assert (and Dr. Atlas' Report avers) that Dr. Atlas is an "expert on human factors, ergonomics, and architectural safety issues." Pls' Opp'n at 2 (citing Pls' Opp'n, Ex. 1 (Atlas Rep.) at 2); *see also* Pls' Opp'n, Ex. 9 (Atlas Resume). Defendant does not challenge Dr. Atlas' qualifications, but rather argues that Dr. Atlas' Report and testimony are not sufficient to establish the relevant standard of care and a breach thereof. *See generally* Def.'s MSJ. Similarly, the Court need not determine whether to accept Dr. Atlas as an expert or whether his Report and testimony are reliable, *cf.* Def.'s MSJ at 11 n.4, because even accepting all of Dr. Atlas' assertions, they are insufficient to establish a breach of a relevant standard of care.

At the outset, the Court notes that, if this case proceeded to trial, Dr. Atlas' testimony would be limited to the issues addressed in his Report and deposition testimony. Pursuant to Rule 26(a)(2)(B) of the Federal Rules of Civil Procedure, Dr. Atlas' Rule 26(a)(2) expert report must contain, *inter alia*, "a complete statement of all opinions [he] will express and the basis and reasons for them; [and] the data or other information [he] considered . . . in forming them." Fed. R. Civ. P. 26(a); *see also Halcomb v. Washington Metro. Area Transit Auth.*,Civ. Action No. 02-1336 (PLF), 2007 WL 4270734, at *2 (D.D.C. Dec. 7, 2007). "The purpose of Rule 26(a)(2) is to prevent unfair surprise at trial and to permit the opposing party to prepare rebuttal reports, to depose the expert, and to prepare for depositions and cross-examination at trial." *Id.* (citing *Minebea Co., Ltd. v. Papst*, 231 F.R.D. 3, 5-6 (D.D.C. 2005)). Federal Rule of Civil Procedure 37(c)(1) provides that a party may not present information at trial not proffered in an expert's Rule 26(a)(2) report "unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). As the Court lacks any indication that those exceptions would apply in the instant

case, it appears that Dr. Atlas would be limited at trial to testifying as to the opinions included offered in his Report and deposition. *Halcomb*, 2007 WL 4270734, at *2. It is therefore proper to consider whether Dr. Atlas' Report and deposition testimony, taken together, are sufficient to establish the relevant standard of care and a breach thereof.

Plaintiffs appear to argue that Dr. Atlas' opinions establish two relevant standards of care: (1) ASTM 649, and (2) a "customary and standard practice to have mats and warning cones at entrances to buildings that experience winter conditions." *See generally* Pls' Opp'n; Pls' Opp'n, Ex. 1 (Atlas Rep.) at 2. The Court therefore considers each proffered standard in turn, and then briefly addresses Plaintiffs' argument that "several genuine disputes of material facts" exist in this case which "render[] summary disposition inappropriate." *Id.* at 5.

> As the D.C. Circuit has explained, under District of Columbia law, expert testimony
>
> is not sufficient if it merely consists of the expert's opinion as to what he or she would do under similar circumstances. Nor is it enough for the expert simply to declare that the [defendant] violated the national standard of care. Rather, the expert must clearly articulate *and reference* a standard of care by which the defendant's actions can be measured. Thus the expert must clearly relate the standard of care to the practices in fact generally followed by other comparable. . . facilities or to some standard nationally recognized by such units.

*Briggs*, 481 F.3d at 846 (quoting *Clark v. District of Columbia*, 708 A.2d 632, 635 (D.C. 1997)) (emphasis and alterations in *Briggs*); *see also Nat'l Tel. Coop. Ass'n v. Exxon Mobil Corp.*, 244 F.3d 153, 154-55 (D.C. Cir. 2001) ("*Exxon*"). "Generalized references" to standards are insufficient, rather the "expert must proffer 'a specific, articulable (and articulated) standard of care,'" and must relate those standards "directly to the defendant's conduct." *Briggs*, 481 F.3d at 846-47 (quoting *District of Columbia v. Moreno*, 647 A.2d 396, 400 (D.C. 1994); *District of Columbia v. Carmichael*, 577 A.2d 312, 315-16 (D.D.C. 1990); and *Phillips v. District of*

17

*Columbia*, 714 A.2d 768, 773 (D.D.C. 1998)).  Moreover, "articulation of a specific standard is

essential '[e]specially in circumstances in which . . . the defendant is alleged to have failed to

protect the plaintiff from harm.'" *Briggs*, 481 F.3d at 847 (quoting *Varner*, 891 A.2d at 269)

(alterations in *Briggs*).

   *1. ASTM 649*

   The Court has no trouble concluding that ASTM 649 is the type of "specific, articulable

(and articulated) standard of care" that is required to prove negligence under District of Columbia

law.  Dr. Atlas identifies ASTM 649 as the applicable standard of care in his Report, *see* Def.'s

MSJ, Ex. 1 (Atlas Rep.) at 1, and in his deposition testified that the ASTM "is probably your

single source of literature and/or testing standards, and/or standards of care, that the other major

publications used as a reference point," Def.'s MSJ, Ex. 2 (Atlas Dep.) at 54:6-10.  According to

Dr. Atlas, the "American[s with] Disabilities Act, and the National Fire Protection Association,

Life Safety Code and all the other major sort of building codes that use stable and firm surfaces

and those kinds of wordings, and the 0.5 is the threshold.  That all stems back to the ASTM

tests." *Id.* at 54:10-16.  This uncontroverted testimony is sufficient to establish that ASTM 649

is a national standard of care that is recognized by comparable facilities, and that provides a

benchmark against which Defendant's actions can be measured.  *See Clark*, 708 A.2d at 635.

   Plaintiffs' problem is not that Dr. Atlas' testimony is insufficient to establish ASTM 649

as the applicable standard of care, but rather that, based on Dr. Atlas' testimony regarding the

tests he performed on the floor where Mr. Frazza slipped, Plaintiffs cannot demonstrate that Mr.

Frazza's fall was caused by Defendant's breach of the relevant standard of care.  As discussed

above, Dr. Atlas' testing revealed that the floor where Mr. Frazza fell had a coefficient of friction

of 0.57 when dry, and 0.85 when wet.  *See* Def.'s MSJ, Ex. 1 (Atlas Rep.) at 1-2; Def.'s MSJ,

Ex. 2 (Atlas Dep.) at 39:4-6, 50:4-7, 51:1-52:19.[9]  Both of these coefficients of friction are above

the benchmark of 0.5 set forth in ASTM 649, and are therefore considered acceptably safe.  *Id.*

Not surprisingly, Plaintiffs' Opposition focuses on Dr. Atlas' finding that the floor in icy

conditions had a coefficient of friction of 0.34, which is below the ASTM 649 standard, and

therefore considered slippery.  *See* Pls' Opp'n at 5, 6-7 (citing Pls' Opp'n, Ex. 1 (Atlas Rep.) at

1).  However, Mr. Frazza never indicated to Dr. Atlas that there was ice on the floor when he fell,

*see* Def.'s MSJ, Ex. 2 (Atlas Dep.) at 55:6-12, and during his deposition, Mr. Frazza himself

described the floor as wet, rather than icy, *see* Pls' Opp'n, Ex. 3 (Frazza Dep.) at 49:19-25;

Def.'s MSJ, Ex. 3 (Frazza Dep.) at 53:2-9.  Moreover, the "Relevant Facts" section of Plaintiffs'

Opposition, which was filed after Defendant raised the issue of an icy versus wet floor in its

Motion for Summary Judgment, describes the floor as wet, rather than icy.  *See* Pls' Opp'n at 3.

Thus, while Dr. Atlas speculated in his deposition that Mr. Frazza may have tracked ice

onto the floor as he entered from the outside, the record is devoid of any evidence whatsoever

that there was actually ice on the floor when Mr. Frazza fell.  Def.'s MSJ, Ex. 2 (Atlas Dep.) at

68:6-69:4.  As a result, if this case went to trial "the jury could only find negligence through

---

[9] Dr. Atlas' finding (and deposition testimony) that the floor in question actually became less slippery when wet because it created a suction effect substantially undercuts his suggestion–discussed below–that Defendant violated an applicable standard of care by failing to have warning cones and mats in place on the floor on which Mr. Frazza slipped.  *See* Def.'s MSJ, Ex. 2 (Atlas Dep.) at 51:1-52:19.  Dr. Atlas' Report suggests that it was foreseeable that the floor would become slippery because "vinyl tile [] by normal design specifications becomes slippery when wet," and because the "floors would have experienced being wet by melting snow or ice being blown or carried in on staff shoes."  Def.'s MSJ, Ex. 1 (Atlas Rep.) at 2.  However, if the actual floor in question did not become any less safe when wet, but rather became more slip resistant, the utility of mats and warning cones is far less clear.

speculation, and 'speculation is not the province of the jury.'" *Thomas v. Grand Hyatt Hotel*, 749 F. Supp. 313, 314-15 (D.D.C. 1990) (quoting *Harris v. Safeway Stores, Inc.*, 329 A.2d 436, 436 (D.C. 1974)); *see also Wilson v. Washington Metro. Area Transit Auth.*, 912 A.2d 1186, 1189-90 (D.C. 2006) (affirming trial court's grant of judgment as a matter of law following trial because there was "only the bare statement of appellant that she slipped and fell, and noticed dry sticky coda on her hand after the fall," and "no reasonable juror could have found for her on the issue of causation.").

To prove negligence, Plaintiff must demonstrate by a preponderance of the evidence "the applicable standard of care, a deviation from that standard by the defendant, and a causal relationship between the deviation and the plaintiff's injury." *Varner*, 891 A.2d at 265. Dr. Atlas' testimony is sufficient to establish ASTM 649 as the applicable standard of care, and may be sufficient demonstrate that the floor's coefficient of friction of 0.34 in icy conditions deviates from that standard of care. Nevertheless, in the absence of any evidence that Mr. Frazza's fall was caused by ice on the floor, and in light of Mr. Frazza's own testimony–and Opposition statement–that the floor was wet (rather than icy) when he fell, Plaintiffs cannot demonstrate the requisite causal relationship between Defendant's alleged deviation from ASTM 649 and Mr. Frazza's injury. Thus, to the extent that Plaintiffs rely upon ASTM 649 as the relevant standard of care, their negligence claim fails as a matter of law.

2.    *Dr. Atlas' Testimony Regarding the Use of Mats and Cones*

Plaintiffs also appear to argue that they can prove their negligence case based on Dr. Atlas' conclusions that "it is customary and standard practice to have mats and warning cones at entrances to buildings that experience winter conditions," that the White House maintenance

staff breached this "standard" by not having warning cones and mats in place in the foyer entrance where Mr. Frazza slipped, and that if a mat had been in place "the accident would not have occurred."  Pls' Opp'n at 7-9; Pls' Opp'n, Ex. 1 (Atlas Rep.) at 2.  As an initial matter, the Court notes that Dr. Atlas' purported "customary and standard practice" is belied by his deposition testimony that mats are often used in buildings with floor coverings other than vinyl tiles, that mats and cones were not used in all buildings he observed during his October 20, 2006 visit to Washington, D.C., and that areas where the public is expected to travel might be "handled differently" than areas not commonly used by the public.  Pls' Opp'n, Ex. 7 (Atlas Dep.) at 75:4-10, 77:15-79:21.

    In any event, Dr. Atlas' testimony regarding the use of mats and cones does not establish "a specific, articulable (and articulated) standard of care."  *Carmichael*, 577 A.2d at 315-16. Significantly, Dr. Atlas bases his testimony on two things: his own "experience" and his observations of buildings in Washington D.C. on a rainy day.  *See* Def.'s MSJ, Ex. 1 (Atlas Rep.) at 2; Pls' Opp'n Ex. 7 (Atlas Dep.) at 74:1:75:3.  However, an expert cannot rely upon "his own experience and on anecdotal observations to form an opinion" because these things fail "to provide any basis . . . by which *the jury* could determine what the standard of care was and how [Defendant's] conduct deviated from it."  *Carmichael*, 577 A.2d at 315-16; *see also Varner*, 891 A.2d at 273 ("An expert may not rely upon a general duty of care to establish an objective standard requiring specific conduct") (quoting *Carmichael*, 577 A.2d at 315, for the proposition that "when normative standards are used by an expert as a basis for assessing negligence, at the very least the expert must be specific as to what standards were violated and how they were violated.").

21

Plaintiffs proffer two responses to Defendant's assertion that Dr. Atlas' opinion does not establish a standard of care regarding the use of mats and cones, neither of which is ultimately availing. First, Plaintiffs cite *Levy v. Schnabel Foundation Co.*, 584 A.2d 1251, 1255 (D.C. 1991), for the proposition that "where an expert in the field has testified that specific precautionary measures would have reduced or eliminated the risk to the plaintiff, and where the defendant has failed to present any explanation of its failure to utilize these measures, some inference of negligence might rationally be drawn." Pls' Opp'n at 8. Plaintiffs' citation of *Levy* is accurate, but nevertheless does not establish that Defendant may be found negligent for failing to have a mat in place simply because Dr. Atlas believes that Mr. Frazza would not have fallen if a mat had been used. *Levy* was a negligence action for damage to property adjacent to a construction site, in which both parties' experts testified that the relevant standard of care was "to take all necessary steps to prevent any movement that would cause damage to adjacent properties." *Levy*, 584 A.2d at 1255. Although the D.C. Court of Appeals recognized that standard of care as "rather unorthodox" and perhaps "more like a lofty goal," it also found the standard supported by sufficient expert testimony (albeit "barely") and "not necessarily unreasonable in [the] particular context." *Id.* at 1252, 1255-56. Accordingly, because the relevant standard of care required the defendant to take all steps necessary to prevent damage to the plaintiff's property, the *Levy* court stated that an inference of negligence might arise where a defendant does not explain a failure to utilize a precautionary measure testified to by the plaintiff's expert. *Id.* at 1255.

Here, neither party posits (and Dr. Atlas does not opine) that the relevant standard of care required Defendant to do everything necessary to prevent Mr. Frazza from falling. Rather, under

District of Columbia law, Defendant was required to take "reasonable care under the circumstances," *Sandoe*, 559 A.2d at 742, and the issue is determining what constitutes reasonable care in these circumstances, *Haney*, 2007 WL 2936087, at *4. Dr. Atlas' Report and deposition testimony regarding the use of mats and cones is unavailing in this respect, because it does not establish a "standard of care [that is] related either to 'practices in fact generally' followed or 'to some standard that is nationally recognized,'" *Exxon*, 244 F.3d at 157 (quoting *Arnold & Porter*, 756 A.2d at 433, and rejecting the plaintiff's attempt to rely upon *Levy* because the plaintiff "introduced no evidence that [its proposed standard of care] was not merely a goal but was in fact the prevailing practice or a national standard."). Dr. Atlas' observations of mats and cones in use in Washington, D.C. on a rainy day fall far short of demonstrating a "prevailing practice" generally followed by "similarly situated parties." *Exxon*, 244 F.3d at 154, 157. At bottom, Dr. Atlas' Report contains his "opinion as to what [he] would do under similar circumstances," *Clark*, 708 A.2d at 635, which even *Levy* recognizes is insufficient to establish a relevant standard of care, *Levy*, 584 A.2d at 1255.

Finally, Plaintiffs argue that Dr. Atlas' opinion regarding the use of mats and cones is sufficient to establish a standard of care because during his deposition, he "expressly groun[ed] his opinion in published material, including GSA guidelines produced in this case," and because the White House maintenance employees working on the day that Mr. Frazza fell "testified that the use of mats and cones in wet or icy conditions was standard practice at the White House." *See* Pls' Opp'n at 9-10. As an initial matter, for reasons discussed above, it is far from clear that the GSA guidelines to which Dr. Atlas refers in his deposition actually require the use of mats and cones during inclement weather in the particular entryway where Mr. Frazza slipped. *See*

Pls' Opp'n, Ex. 7 (Atlas Dep.) at 81:9-83:5; Pls' Opp'n, Ex. 10 (GSA "Facility Standards for the Public Building Service") at 95.  Moreover, even if GSA policy would require a mat to be used in the foyer in question during inclement weather, "an . . . internal agency procedure [that is] not a statute or regulation . . . cannot embody the standard of care under a negligence *per se* theory" because "expert testimony [is] still required to establish that the [internal policy] embodied the national standard of care and not a higher, more demanding one."  *Clark*, 708 A.2d at 636.  A defendant "cannot be held liable for aspiring to efforts beyond an applicable national standard."  *Id.*  "To hold otherwise would create the perverse incentive for [Defendant] to write its internal operating procedures in such a manner as to impose minimal duties upon itself in order to limit civil liability rather than imposing safety requirements upon its personnel that may far exceed those followed by comparable institutions."  *Id.*; *see also Arnold & Porter*, 756 A.2d at 435.

Plaintiffs also emphasize the testimony of White House maintenance personnel that "that the use of mats and cones in wet or icy conditions was standard practice at the White House," and that mats and cones were used in the area where Mr. Frazza fell.  *See* Pls' Opp'n at 9-10; *see generally* Pls' Opp'n, Ex. 5 (Rose Dep. Tr.) and Ex. 6 (Taylor Dep. Tr.).  Nevertheless, Plaintiffs proffer no expert testimony regarding the relative slipperiness, when wet, of the mats usually used in the White House and the actual vinyl tile floor where Mr. Frazza fell.  In particular, Dr. Atlas offers no evidence that a mat would have been any safer (or even as safe as) the actual vinyl tile floor, which had a coefficient of friction of 0.85 when wet.

In any event, neither internal GSA policies nor the testimony of White House maintenance personnel is sufficient to establish either negligence *per se* or a relevant standard of care.  As a result, the factual question of whether a mat was in place when Mr. Frazza fell–as

well as whether a mat was usually used in the particular entryway–is ultimately irrelevant.  Even

if no mat was in place, "[i]f the standard itself is not proven, then a deviation from that standard

is incapable of proof."  *Carmichael*, 577 A.2d at 314.

>    3.    *Plaintiffs Do Not Demonstrate the Existence of "Genuine Disputes of Material Fact"*

Having concluded that Plaintiffs do not proffer expert testimony sufficient to establish

either a relevant standard of care or a breach thereof, the Court briefly addresses Plaintiffs'

erroneous contention that "[t]here are several genuine disputes of material facts rendering

summary disposition inappropriate" in this case.  Pls' Opp'n at 5-6.  Plaintiffs first argue that a

genuine dispute exists as to whether Dr. Atlas properly calculated the coefficient of friction of the

floor where Mr. Frazza fell as 0.34 in icy conditions.  *See* Pls' Opp'n at 5.  To the contrary,

"Defendant does not contend that Dr. Atlas improperly calculated the coefficient of friction."

Def.'s Reply at 4.  Instead, Defendant argues that the coefficient of friction of the floor under icy

conditions is not relevant because the record is devoid of evidence that the floor was actually icy

(as opposed to wet) when Mr. Frazza fell, and Dr. Atlas' own testing reveals that the floor was

acceptably safe when wet.  *Id.*  For reasons discussed in detail above, the Court agrees with

Defendant that there is no factual dispute as to the coefficient of friction of the floor in icy

conditions and that, in any event, such a factual dispute would not be material.  *See Liberty

Lobby*, 477 U.S. at 248 ("Only disputes over facts that might affect the outcome of the suit under

the governing law will properly preclude the entry of summary judgment.").

Plaintiffs also assert that the following issues remain in dispute: (1) whether a mat was in

place when Mr. Frazza slipped; (2) whether a mat would have prevented Mr. Frazza from falling;

and (3) whether it is customary in the industry to use warning cones and mats during inclement

weather.  Taking those assertions in reverse order, the Court concludes that none demonstrates

the existence of genuine question of material fact.  Again, Federal Rules of Civil Procedure

26(a)(2) and 37(c) preclude Dr. Atlas from testifying at trial as to issues not addressed in his

Report or deposition testimony.  It is therefore appropriate to grant summary judgment to

Defendant where Dr. Atlas' Report and deposition testimony fail to establish a national standard

of care regarding the use of cones and mats.  *See Briggs*, 481 F.3d at 858.  Moreover, because

Plaintiffs fail to establish that the absence of a mat would violate any relevant standard of care, it

is immaterial whether a mat might have prevented Mr. Frazza's fall or whether a mat was, in

fact, in place.  In order to prevail on their negligence claim, Plaintiffs must establish "the

applicable standard of care, a deviation from that standard by the defendant, and a causal

relationship between the deviation and the plaintiff's injury."  *Varner*, 891 A.2d at 265.  As such

Plaintiffs' "failure to establish a standard of care is 'fatal to [their] negligence claim.'"  *Briggs*,

481 F.3d at 848 (quoting *Scott v. District of Columbia*, 101 F.3d 748, 757 (D.C. Cir. 1996)).  The

Court therefore concludes that summary judgment for Defendant is entirely appropriate.

## IV.  CONCLUSION

For the foregoing reasons, the Court shall GRANT [13] Defendant's Motion for

Summary Judgment, and shall DISMISS this case in its entirety.  An appropriate Order

accompanies this Memorandum Opinion.

Date:  January 7, 2008

                                          */s/*
                                          COLLEEN KOLLAR-KOTELLY
                                          United States District Judge